119 Cal.Rptr.2d 42 (2002)
97 Cal.App.4th 990
ESTATE OF Laverne SHINKLE, Deceased.
C.J. Thompson, Petitioner and Appellant,
v.
Les Lindop, as Acting Public Administrator, etc., et al., Objectors and Respondents.
No. H022305.
Court of Appeal, Sixth District.
March 28, 2002.
*43 Stephen S. Picone, Picone & DeFelippis, San Jose, for Petitioner and Appellant: C.J. Thompson.
Ann Miller Ravel, County Counsel, Kathryn J. Zoglin and Tamara Lopez, Deputy County Counsel, for Objector and Respondent: Les Lindop, as Acting Public Administrator, etc., et al.
Charles Allen Triay, Oakland, for Objector and Respondent: Troy Bunning and other heirs.
BAMATTRE-MANOUKIAN, Acting P.J.
C.J. Thompson appeals from a judgment after a court trial in a probate matter in which the court held that a trust instrument from which Thompson had benefited was void pursuant to Probate Code section 21350.[1] Section 21350, subdivision (a)(6) (hereafter section 21350(a)(6)) provides that any instrument that makes a donative transfer to a "care custodian of a dependent adult" is invalid. Thompson was the beneficiary of a trust executed by Laverne Shinkle. Shinkle had resided in a skilled nursing facility for almost three years. During most of that time, Thompson was the long-term-care ombudsman for the facility. The definition of a "care custodian" who is prohibited from receiving a donative transfer under section 21350(a)(6) includes a long-term-care ombudsman. *44 Thompson claims the trust was valid because he was no longer Shinkle's ombudsman when she signed the trust. Thompson had been transferred to another facility six months before the trust was executed. In addition, Shinkle was discharged from the facility a month and a half before she signed the trust.
We hold that an ombudsman remains a "care custodian" within the contemplation of section 21350(a)(6) even after his or her formal ombudsman relationship with a particular resident has ended, due either to a change in the ombudsman's facility assignment or the fact that the resident has left the facility, when the ombudsman, as a result of his or her fiduciary relationship with the resident, develops a personal relationship with the resident and thereby acquires personal and financial information regarding the resident. This is particularly so when the ombudsman, as in this case, is still certified at the time of the transfer at issue. Thus, the trial court was correct in finding that Thompson was a "care custodian" under section 21350(a)(6).
Upon finding that a person is prohibited from receiving a transfer under section 21350, section 21351 creates a rebuttable presumption that the transfer was the product of fraud, duress, menace, or undue influence. A person who is prohibited from receiving a transfer under section 21350 may still inherit, if the transferor obtains independent review of the donative instrument by an attorney (§ 21351, subd. (b)) or if the transferee successfully rebuts the section 21351 presumption (§ 21351, subd. (d).) In order to rebut the presumption, the transferee must present clear and convincing evidence, which does not include his or her own testimony, that the transfer was not the product of fraud, duress, menace, or undue influence. (§ 21351, subd. (d).) We hold that the trial court's finding that Thompson did not meet his burden of rebutting the presumption is supported by substantial evidence. We will therefore affirm the judgment.

FACTUAL BACKGROUND
Laverne Shinkle was 77 years old in October 1995 when she fell and fractured her right hip. As part of her recovery, she was hospitalized at the extended care facility at South Valley Hospital (South Valley), where she met C.J. Thompson. Thompson, a retired schoolteacher, was assigned to the facility as the volunteer long-term-care ombudsman.
The long-term-care ombudsman program is mandated by state law to investigate claims made by or on behalf of residents of long-term care facilities. In Santa Clara County, the program is administered by Catholic Charities and is staffed largely by volunteers like Thompson. After completing a 36-hour training program and passing an examination, the volunteer ombudsmen are certified by the State of California. Once certified, the ombudsmen are required to complete 12 hours of additional training each year to maintain their certifications. The ombudsmen serve as advocates for the residents in long-term-care facilities, who are predominantly elderly. The ombudsman's primary function is to receive and investigate complaints made by the residents of the facility. Ombudsmen also broker information regarding other social services agencies. Ombudsmen are mandated reporters for elder abuse. In addition, their duties include witnessing durable powers of attorney and documents related to property transfers. The relationship between the ombudsman and the facility residents was described by the director of the long-term ombudsman program in Santa Clara County (program director) as a "confidential relationship ... built on trust and trustworthiness." The ombudsmen *45 are expected to be impartial and objective with facility residents and staff. According to the program director, it is not part of the ombudsman's role to help residents pay bills, do the residents' banking, run personal errands for the residents or help them with estate planning. The ombudsmen are to be friendly toward the residents, but not develop friendships with individual residents. The ombudsman's role does not include writing letters for, reading to or shopping for residents. Such functions, which are referred to as "friendly visiting," are performed by another social services agency. According to the program director, it is inappropriate for an ombudsman to visit a former resident in his or her home after he or she leaves a facility or to accept gifts from a resident.
Thompson completed his ombudsman training in the spring of 1995. He admits that he learned, during his initial training, that it was inappropriate to receive gifts from the residents he served. Thompson was certified in September 1995. He began serving as the ombudsman at South Valley a couple of months before he met Shinkle in November of 1995.
On November 17, 1995, Shinkle advised the staff at South Valley that she needed help in retrieving certain personal effects from her home. No one was available to assist her and she inquired whether Thompson could do it. Thompson did not know how to respond and contacted the program director for advice. She told him that it was not part of an ombudsman's normal responsibilities, but if no one else was available, he could retrieve the items for Shinkle if he had a police escort. Thompson obtained a list of the items Shinkle wanted, which included Shinkle's checkbook and some cash, and obtained the items from her home under police escort.
A few days after this event, Shinkle was transferred from South Valley to the Gilroy Health Care Facility (GHC), a skilled nursing facility. Thompson was also the ombudsman at GHC. Around November 30, 1995, Thompson began helping Shinkle write checks to pay her bills. He would fill out all of the information on the check, except for the signature, then have Shinkle sign the check. Thompson also mailed Shinkle's bills and balanced her checkbook. He took her checkbook home with him on occasion, to check her math. Thompson admitted in deposition that he thought these activities were outside of his role as an ombudsman. However, he thought it was appropriate for him to assist her in this way, as her friend. At trial, he testified that he did not give any thought to whether he was acting outside of his role as an ombudsman when he helped Shinkle pay her bills. In addition to helping Shinkle pay her bills, Thompson cashed and/or deposited checks for her at her bank, assisted her with other banking matters and ran other errands for her. He did not assist any of the other facility residents with writing checks.
In November 1995, Thompson learned that Shinkle had no family, that she was a "private payor" and not a Medi-Cal patient, and that she had over $300,000 in liquid assets. Thompson eventually learned that Shinkle owned a home in Gilroy and a rental property in Morgan Hill.
Initially, the staff at GHC expected that Shinkle would go home after completing her physical therapy. Shinkle was not compliant with her therapy and did not recover from the hip fracture as expected. The social services assistant at GHC opined that Shinkle had gotten used to being around other people at GHC and did not want to return home. Shinkle had tried a home visit in 1996. It proved *46 harder than she expected. She returned to GHC after only three hours at home. Shinkle's home was broken into in 1996 or 1997. After that, she told the social services assistant that she was afraid to go home.
Shinkle remained at GHC from mid-November 1995 until September 11, 1998. Thompson was her ombudsman during most of that time. He visited her every week or two between November 1995 and April 1998. During that time, he continued to assist Shinkle with her bills and her banking. Early in their relationship, Shinkle told Thompson that she wanted to leave her estate to him. At first, he thought her offer was crazy, because she barely knew him. Shinkle told Thompson numerous times throughout their relationship that she wanted to leave him her estate. A year or two into the relationship, Thompson told Shinkle that if she wanted to leave him her estate, she would have to do something to make it happen.
On April 23, 1998, the ombudsman program transferred Thompson to another facility. From that point forward, he was no longer assigned to GHC. As of April 23, 1998, Thompson had no plans to see Shinkle again.
In early June 1998, Shinkle called Thompson and asked him to visit her at GHC. He went and saw her that same day. He claims that he was acting as her friend and not as her ombudsman. When Thompson visited Shinkle in early June 1998, she told him that she wanted to go home and was concerned about having someone make decisions for her if she was not able to decide for herself. She wanted information regarding a durable power of attorney for health care. She did not ask him for information regarding a trust. According to Thompson, Shinkle didn't even know what a trust was. She did not ask for help with a will or estate planning. Thompson recommended she contact Jay Campbell at Arthur, Nordmark and Carr (ANC), an estate planning firm. Thompson knew about Campbell from some articles Campbell had written on estate planning for the American Association of Retired Persons (AARP) newsletter. Shinkle asked Thompson to call Campbell for her.
Thompson called Campbell on June 3, 1998, and told him he was calling for Shinkle. Thompson told Campbell that Shinkle was single, had no heirs, and owned two pieces of property. Thompson's testimony at tidal was inconsistent as to the type of services he requested for Shinkle on June 3, 1998. At first, Thompson testified that he requested information regarding a durable power of attorney for health care. Later, he testified that he asked Campbell to send him information regarding a living trust. Campbell's testimony corroborated the latter request. Campbell sent Thompson some estate planning material for Shinkle to review. According to Thompson, Shinkle had asked that ANC mail the information to Thompson because she did not want anyone at GHC to know that she was creating a trust in Thompson's favor.
Thompson continued to visit Shinkle at GHC every week or two between early June and her discharge in mid-September. According to the ombudsman program director, it was inappropriate for Thompson to return to GHC in a non-ombudsman role after he was reassigned to another facility because it could be confusing to the residents and the staff. Thompson claims that he never initiated any of his visits to Shinkle after April 23, 1998, and that he only visited her at her request.
Campbell called Thompson seven times between early June 1998 and early September 1998 to follow up regarding ANC's estate planning services. Each time, he *47 was unable to reach Thompson. Campbell did not leave a message, since he did not want to pressure Thompson. He never tried calling Shinkle. On September 8, 1998, Campbell called Thompson again and spoke with him. Thompson told Campbell that Shinkle was not ready to discuss Campbell's services, that he would talk to her, and that he would call Campbell when Shinkle was ready.
On September 11, 1998, Shinkle went home. The evidence regarding her condition at that time was disputed. The social services assistant at GHC testified that she was concerned about Shinkle's plan to go home because Shinkle did not walk and was dependent on the staff at GHC for everything. Shinkle's treating physician was concerned about Shinkle's ability to be home alone because of her physical condition. She needed assistance with most activities of daily living, including cooking, toileting, and bathing. The doctor did not feel it was wise for Shinkle to leave GHC, but did not feel he could detain her, either. When she left GHC, Shinkle arranged for Ruth Cano, one of the nursing assistants at GHC, to come in one hour each morning and one hour each evening to assist Shinkle with food preparation and bathing. According to Cano, Shinkle was walking with a cane when she went home.
Thompson continued to visit Shinkle every week or two after she went home. He continued to help her with her banking and with her bills. After Shinkle went home, Thompson told her that it was "okay" for her to leave her estate to him, since he was no longer her ombudsman. On September 15, 1998 and September 25, 1998, Campbell called Thompson regarding estate planning services for Shinkle. Both times, Thompson told Campbell that Shinkle was not ready.
Toward the latter part of September 1998, Shinkle fell at home. According to Cano, she stopped walking and became incontinent about a week later. From this point forward, Shinkle slept in a chair in the living room. When Cano arrived in the morning, she carried Shinkle to a chair at the kitchen table. Shinkle remained there until Cano returned later in the day. In the evening, Cano made Shinkle her dinner, then carried her back to the living room chair, where she slept. After the fall, Shinkle complained of pain daily and told Cano she wanted to die.
On September 25, 1998, the social services assistant at GHC, Sherlyn Hardesty, visited Shinkle at home. She observed that Shinkle's legs were full of fluid. She saw ulcerations and seeping wounds. The house smelled of urine. Shinkle appeared depressed. She had a hard time collecting her thoughts and expressing herself. She appeared slow and sluggish, as if over-medicated. Hardesty offered to take Shinkle to a doctor or GHC, but Shinkle refused. Hardesty filed a report with adult protective services.
Sometime after September 25, 1998, Thompson called Campbell and advised him that Shinkle was ready to discuss Campbell's services. An appointment was scheduled for October 12, 1998 in Shinkle's home. When Campbell arrived on October 12, 1998, Thompson met him at Shinkle's back door, escorted him into the kitchen and introduced him to Shinkle, who was seated at the kitchen table. Campbell, who was an estate planner, not an attorney, met with Shinkle for an hour to an hour and a half. During the meeting, Campbell asked Shinkle whether she wanted Thompson to leave and she said she wanted him to stay. Thompson remained in the kitchen throughout the entire meeting. He stood near the sink, five to six feet away from where Campbell and Shinkle were seated. Shinkle told Campbell she had no children and no relatives and *48 wanted Thompson to help her with her financial affairs and health care issues. Campbell did not offer her the option of preparing durable powers of attorney for finances and health care. Instead, he started the discussion by describing how a trust would avoid probate and allow Thompson to take care of her affairs. Next, Campbell talked with Shinkle about the extent of her assets. He then explained the purpose of an abstract of trust, a pour-over will, durable powers of attorneys for finances and health care, and a directive to physicians. Campbell asked Shinkle who should serve as successor trustee if she was unable to manage the trust in her lifetime and she said she wanted Thompson to be the successor trustee. Campbell asked Thompson whether he was willing to serve as successor trustee and he agreed. Campbell then asked Shinkle who she wanted her assets "distributed to" and she responded with Thompson's name.
After Campbell left the meeting with Shinkle, he arranged for a series of documents to be prepared on Shinkle's behalf by the clerical staff at ANC. The documents included the Shinkle Family Trust (trust), an abstract of trust, a pour-over will, durable powers of attorney for health care and financial affairs, a directive to physicians, and documents designed to transfer Shinkle's real property and bank accounts into the trust. After the documents were prepared, Robert Bergman, an attorney retained by ANC, reviewed the documents. Campbell also reviewed the documents.
The trust named Thompson as successor trustee. It also provided that Thompson's wife would serve as successor trustee if Thompson could not serve. In addition, it provided that if Thompson died before Shinkle, all of Shinkle's assets would go to Thompson's children, whom Shinkle had never met.
After the documents were completed, Campbell contacted Thompson and scheduled another meeting with Shinkle for October 26, 1998. Campbell did not send Shinkle the documents to review in advance of the meeting, even though there were over 60 pages of documents in the estate package. Thompson never suggested Shinkle have the documents reviewed by her own attorney.
Campbell returned to Shinkle's home on October 26, 1998, and was met by Thompson. Thompson escorted Campbell into the kitchen, where Shinkle was seated. Campbell's second meeting with Shinkle lasted about an hour. During that time, he reviewed the documents with Shinkle, had her sign each document and initial many of the pages within the documents. Shinkle did not read the documents in their entirety. Campbell did not read the documents to her, although he claims he explained the significance of each document's provisions to her. Thompson remained in the room the entire time. Once again, he stood by the sink, five to six feet behind Shinkle.
There were several irregularities in the execution of the documents. First, Campbell, who was a notary, had affixed his notary seal, swearing to the fact that he had witnessed Shinkle's signature to the documents before he went to the meeting. Second, Campbell had arranged for Mike Rand, one of the telemarketers at ANC, to sign the pour-over will as a witness under penalty of perjury, attesting to the fact that Shinkle and the second witness (Campbell) had signed the will in his presence. Rand did not attend the meeting and did not see Shinkle or Campbell sign the will. Third, Campbell signed the pourover will under penalty of perjury, attesting to the fact that Rand was present and *49 had signed the will in Shinkle's presence. Fourth, Rand signed the directive to physicians, swearing that he knew Shinkle and that he believed her to be of sound mind. Rand never met Shinkle.
After the documents were signed, Thompson arranged for Shinkle's assets to be transferred into the trust. Shinkle paid ANC $1,000 for the trust package. Campbell was paid 40 percent of the fee collected by ANC on all trust packages he completed.
We briefly review the evidence regarding Shinkle's mental and physical condition. On December 16, 1995, while a resident of GHC, Shinkle underwent a psychiatric consultation. The psychiatrist noted that she was fearful and refused to answer questions. He diagnosed her condition as paranoia, possible depression and started her on Haldol. Shinkle's treating physician questioned the psychiatric diagnosis, but continued her Haldol prescription throughout her stay at GHC, ostensibly to help her sleep. According to the GHC staff, Shinkle's mental state fluctuated over the course of her stay at the facility. She had periods of paranoia and was verbally abusive. She was known to hallucinate; she believed she saw family and friends and heard music. A geriatric expert retained by the county testified that Shinkle was paranoid and suspicious throughout her stay at GHC, although the degree of her symptoms differed over time. He also opined that it was malpractice to prescribe Haldol as a sleep aid and that Shinkle was at high risk for undue influence, both before and after she went home in September 1998.
In late September and October 1998, Shinkle had swelling in her legs. Cano noted that her toes had blackened and she continued to have ulcers on her legs. Shinkle was not eating properly. On November 10, 1998, Shinkle's condition worsened. Cano thought she had had a stroke. Cano called Shinkle's doctor and was referred to another physician. He could not come to see Shinkle, but told Cano he would send a nurse the following day. Cano also called Thompson and told him Shinkle was very sick and said she did not know what to do. Thompson told her he would come by the next day. Thompson and the nurse arrived the next morning. Shinkle refused to go to the hospital. The nurse asked Thompson whether he had a durable power of attorney. He said he did, but not with him. He went home to get the paperwork and returned to Shinkle's house at 5:30 that evening. An ambulance was called and Shinkle was taken to the hospital. When admitted to the hospital, she was confused, disoriented, emaciated and wasted. She had multiple decubitous ulcers on her sacrum and both legs. She had severe contracture deformities in her toes and stiffness in all joints. She was dehydrated and malnourished. Initially she was treated with antibiotic therapy, full hydration and skin and wound care. "Later on, there was full authorization for discontinuation of further care as presented by documentation of Power-Of-Attorney for her care presented by Mr. Thompson...." Shinkle fell into a coma. She died on November 13, 1998, at the age of 80. In addition to the conditions noted previously, her final diagnoses included sepsis, gangrene of both legs, and arterial occlusive disease. At the time of her death, Thompson was still serving as a volunteer ombudsman.
Shinkle did have family and friends. The son of one of her neighbors visited her occasionally at GHC. Don Garcia, who had been Shinkle's tenant for 32 years, also visited her. Shinkle had told Garcia that he could do whatever he wanted to her rental property and that the property "belonged" to Garcia and his family. Garcia *50 made improvements to the property at his own expense, including installing sidewalks and a patio and adding a room for his disabled son. Shinkle had told Hardesty, the social services assistance at GHC, that she was fond of the Garcias and planned to leave something to them and to the SPCA. Shinkle was survived by Troy Bunning and the members of Bunning's family. Bunning's mother was Shinkle's first cousin. However, neither Bunning nor her mother nor her siblings had seen Shinkle in over 40 years. Shinkle also had living relatives on her father's side.
After Shinkle's death, Thompson took control of her assets. He held an estate sale and deposited the proceeds of the trust into a money market account. He used some of the money to pay off his mortgage. He also attempted to sell both of Shinkle's properties. When the director of the ombudsman program learned that Thompson had inherited from one of the residents he had served, she suspended Thompson from the program. He was decertified some time after June 1, 1999.

PROCEDURAL HISTORY
On March 22, 1999, the Public Administrator of Santa Clara County filed a petition for letters of special administration regarding the estate of Laverne Shinkle with the probate court. On May 25, 1999, Thompson petitioned the court to determine the existence of the trust. Troy Bunning opposed Thompson's petition on the grounds that Thompson was disqualified from taking from the trust pursuant to section 21350 and on the grounds of undue influence. The public administrator opposed Thompson's petition on the same grounds as Bunning. The public administrator also asserted that Thompson had financially abused Shinkle in violation of Welfare and Institutions Code section 15610.30.
The two petitions were consolidated and were tried before the court in June of 2000. On September 12, 2000, the trial court issued a judgment in which it found that the trust was void, that the trust transfer deed on Shinkle's rental property was void, that Thompson held all properties and cash received by him as a result of the death of Shinkle in constructive trust for the benefit of Shinkle's probate estate, and that Shinkle's estate shall pass by intestate succession. The court ordered Thompson to deliver all property and cash he had received as a result of Shinkle's death to the public administrator, to file an accounting with the probate court within 30 days, and to pay the public administrator all costs associated with the probate proceedings, including, but not limited to, expert witness fees and attorney's fees.[2]
The court found that Thompson was a disqualified beneficiary under section 21350, subdivision (a)(4) because he was a fiduciary who had caused the trust instrument to be transcribed. The court also found that Thompson was a disqualified beneficiary under section 21350(a)(6) because he met the statute's definition of a "care custodian of a dependent adult." The court dismissed Thompson's argument that section 21350(a)(6) did not apply because he was no longer Shinkle's ombudsman after she returned home as "nonsensical." The court also found that after Thompson was found to be disqualified from benefiting from the trust under section 21350, the burden shifted to Thompson to show, by clear and convincing evidence, without the use of his own testimony, that he exercised no undue influence over Shinkle. (§ 21351, subd. (d).) *51 The court found that Thompson had not met this burden. Thompson appeals.

DISCUSSION
Probate Code section 21350, subdivision (a) (hereafter section 21350(a)) provides in pertinent part: "Except as provided in Section 21351, no provision, or provisions, of any instrument shall be valid to make any donative transfer to any of the following: [¶] ... [¶] (4) Any person who has a fiduciary relationship with the transferor, including, but not limited to, a conservator or trustee, who transcribes the instrument or causes it to be transcribed, [¶]... [¶] (6) A care custodian of a dependent adult." "The purpose of [section 21350] is to prevent unscrupulous persons in fiduciary relationships from obtaining gifts from elderly persons through undue influence or other overbearing behavior." (Bank of America v. Angel View Crippled Children's Foundation (1999) 72 Cal.App.4th 451, 456, 85 Cal.Rptr.2d 117.) Section 21350(a) limits donative transfers to certain persons who are in a position to take advantage of the transferor, such as a conservator or trustee who causes the instrument to be transcribed or a care custodian of a dependent adult.
Section 21351 sets forth a number of conditions[3] under which the prohibition *52 of section 21350 does not apply. The only one which has any application in this case is the condition set forth in section 21351, subdivision (d) (hereafter section 21351(d)), which provides that if the donee falls within any category of persons described in section 21350(a), there is a rebuttable presumption of invalidity. Section 21351(d) places the burden on the donee to establish by clear and convincing evidence, excluding the donee's own testimony, that the transfer was not the product of fraud, menace, duress, or undue influence. (§ 21351(d); Estate of Swetmann (2000) 85 Cal.App.4th 807, 816-817, 102 Cal.Rptr.2d 457.)
Section 21351, subdivision (e), limits the application of section 21351(d). Section 21351, subdivision (e), provides that the rebuttable presumption in section 21351(d), only applies in cases (1) where the instrument at issue was executed by someone who was not a resident of California; (2) where the instrument does not make a transfer to a person who drafted the instrument; or (3) where the instrument was executed on or before July 1, 1993, by someone who was a resident of California. Laverne Shinkle was a resident of California on October 26, 1998 when she executed the trust documents at issue here. Thompson did not draft the trust; Campbell, ANC staff and Bergman drafted it. Since the trust does not make a transfer to the persons who drafted it, subdivision (e) of section 21351 does not limit the application of the rebuttable presumption in section 21351(d). Consequently, the rebuttable presumption applies in this case.
Persons who are prohibited from receiving donative transfers under sections 21350 and 21351 are referred to as "disqualified persons." (§ 21350.5.)[4] "Section 21350 implicitly requires a person whose interest in a trust is threatened by a transfer to a disqualified person to affirmatively invoke the protection of the statute by seeking a court order establishing the invalidity of the transfer. The burden then shifts to the transferee to justify the transfer under section 21351." (Graham v. Lenzi (1995) 37 Cal.App.4th 248, 255, 43 Cal.Rptr.2d 407.) Under the statutory scheme, upon a transferee's failure to rebut the presumption of invalidity, the transferee is disqualified from receiving the gift, and the transfer will be made as if the disqualified donee had predeceased the transferor. (§§ 21350.5, 21353.)[5] Further, upon a finding that the transfer was the product of fraud, menace, duress, or undue influence, the disqualified donee must pay all attorney fees and costs of the proceeding. (§ 21351(d).)
The trial court found that Thompson was disqualified under two prongs of section *53 21350. The court found that Thompson was prohibited from benefiting from the trust because he was both a fiduciary who caused the trust instrument to be transcribed (§ 21350, subd. (a)(4)) and a "care custodian of a dependent adult" (§ 21350(a)(6)). Under section 21351(d), the burden then shifted to Thompson to show, by clear and convincing evidence, not including his own testimony, that the transfer was not the product of fraud, menace, duress, or undue influence. The trial court found that Thompson did not meet this burden and that the transfer to Thompson was therefore invalid.
We begin by examining the trial court's finding that the trust transfer was prohibited under section 21350(a)(6) because Thompson was a "care custodian of a dependent adult." Since our analysis requires us to interpret the meaning of the phrases "dependent adult" and "care custodian" in section 21350(a)(6), we review the matter de novo. Appellate courts independently determine the proper interpretation of a statute. (People ex rel. Lockyer v. Shamrock Foods Co. (2000) 24 Cal.4th 415, 432, 101 Cal.Rptr.2d 200, 11 P.3d 956.)

Shinkle was a "dependent adult" under section 21350(a)(6)
Section 21350, subdivision (c) (hereafter section 21350(c)) adopts the definition of a "dependent adult" set forth in section 15610.23 of the Welfare and Institutions Code, which defines "dependent adult" as: "any person residing in this state, between the ages of 18 and 64 years, who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights including, but not limited to, persons who have physical or developmental disabilities or whose physical or mental abilities have diminished because of age." Section 21350(c) extends this definition to persons who are "older than age 64."
Appellant does not contest the trial court's finding that Shinkle was a dependent adult under section 21350(c). She was 77 years old when she met Thompson. She had difficulty walking when she left GHC. By the time she executed the trust, she was no longer walking. She needed assistance with most activities of daily living, including cooking, bathing and toileting. She no longer did her own banking and needed help paying her bills. The trial court correctly found that Shinkle was a dependent adult.

Thompson was a "care custodian" under section 21350(a)(6)
Section 21350(c) provides that the term "care custodian" in section 21350(a)(6) has the meaning set forth in Welfare and Institutions Code section 15610.17. Section 15610.17 defines "care custodian" as "an administrator or an employee of any of the following public or private facilities or agencies, or persons providing care or services for elders or dependent adults, including members of the support staff and maintenance staff: [¶] ... [¶] (s) The office of the long-term care ombudsman. [¶] ... [¶] (v) Any other protective, public, sectarian, mental health, or private assistance or advocacy agency or person providing health services or social services to elders or dependent adults."
Thompson asserts that he was not a "care custodian" and therefore not disqualified from benefiting from the trust because he was no longer Shinkle's ombudsman when she executed the trust. Thompson's argument is based on (1) the fact that he was transferred and no longer the ombudsman for GHC after April 23, 1998; and (2) the fact that Shinkle was no longer a resident of GHC, receiving ombudsman *54 services, when she signed the trust. Thompson argues that he was only an "informal friend," providing "friendly aid to an at-home individual," when the trust was executed.. We reject Thompson's arguments.
The definition of "care custodian" in Welfare and Institutions Code section 15610.17 is broad. It includes administrators and employees of 21 different types of public or private facilities or agencies and "persons providing care or services for elders or dependent adults, ..." (§ 15610.17.) It includes the maintenance and support staffs for those agencies and facilities. The 21 agencies and facilities listed in section 15610.17 include the office of the long-term care ombudsman. (§ 15610.17, subd. (s).) Welfare and Institutions Code section 15610.50 defines "[l]ong-term care ombudsman" as it is used in section 15610.17 as "the State Long-Term Care Ombudsman, local ombudsman coordinators, and other persons currently certified as ombudsmen..."
Welfare and Institutions Code section 15610.17 also contains a catch-all provision in subdivision (v), which provides that the definition of a care custodian shall include: "[a]ny other protective, public, sectarian, mental health, or private assistance or advocacy agency or person providing health services or social services to elders or dependent adults." Thus, the definition of care custodian includes a broad range of agencies or persons providing health care or social services to dependent adults, including ombudsmen like Thompson.
Thompson's relationship with Shinkle arose out of his volunteer work as an ombudsman. But for the ombudsman program, Thompson would not have met Shinkle, would not have had access to her financial and personal information, and would not have gained her trust. He would not have learned that she had few friends and no contact with her family. Thompson was a "care custodian" under Probate Code section 21350(a)(6) and Welfare and Institutions Code section 15610.17 while he served as Shinkle's ombudsman at GHC and South Valley. Thompson's work as an ombudsman, as a "care custodian" under section 21350(a)(6), enabled him to gain access to Shinkle and to gain her confidence.
The trust relationship Thompson developed with Shinkle as a result of his ombudsman position continued after he was transferred to another facility and after Shinkle went home. Furthermore, Thompson understood the nature of his fiduciary relationship with Shinkle and was still a certified ombudsman when the trust documents were executed and when Shinkle died. Thompson's status as a care custodian for Shinkle did not change after he was transferred or after she went home. If that were the case, an ombudsman could inherit from a former resident after that person was discharged from the facility, thereby circumventing the purpose of section 21350. If we were to adopt Thompson's reasoning and find that he was no longer a "care custodian" for Shinkle, either after he transferred or after she went home, individuals like Thompson could avoid the prohibitions of section 21350 merely by changing their assignments, changing jobs, or ceasing to provide volunteer services in order to benefit from a donative transfer from someone with whom they had previously had a fiduciary relationship. Such a construction would be contrary to the purpose of section 21350, which is to prevent care custodians from taking advantage of their elderly charges and obtaining gifts through undue influence.
There is no limiting language in Probate Code section 21350(a)(6) or Welfare and Institutions Code section 15610.17 which distinguishes between activity undertaken by ombudsmen in their role as *55 ombudsmen and activities undertaken by ombudsmen, vis-à-vis the population they serve, on their own time or outside their role as ombudsmen. If we were to permit different rules to apply, depending upon whether an ombudsman was acting within or outside of his or her role as ombudsman, we would invite just the kind of abuse that occurred in this case. Both the program director and another volunteer ombudsman testified that Thompson's conduct in befriending Shinkle, paying her bills and doing her banking was inappropriate for an ombudsman. These were the very activities that allowed Thompson to gain Shinkle's trust and information about her financial affairs.
We hold that a long-term-care ombudsman is a "care custodian" for the purposes of section 21350(a)(6) during the time that he or she serves as ombudsman for a particular "dependent adult." In addition, we hold that an ombudsman remains a "care custodian" within the contemplation of section 21350(a)(6) even after his or her formal ombudsman relationship with a particular resident has ended, due either to a change in the ombudsman's facility assignment or the fact that the resident has left the facility, when the ombudsman, as a result of his or her fiduciary relationship with the resident, develops a personal relationship with the resident and thereby acquires personal and financial information regarding the resident. This is particularly so when the ombudsman, as was the case here, is still certified at the time of the transfer at issue. We therefore conclude that under the facts of this case Thompson was a "care custodian of a dependent adult" and that he was prohibited from benefiting from the trust pursuant to section 21350(a)(6).
In light of our holding, we need not reach Thompson's argument that he was not a "care custodian" because he did not provide Shinkle with any kind of "social services" after she went home. (Welf. & Inst.Code, § 15610.17, subd. (v).) Furthermore, we need not reach Thompson's argument that he was not a fiduciary who caused the trust to be transcribed and was therefore not a disqualified person under section 21350, subdivision (a)(4).

The trial court's finding that Thompson did not meet his burden of rebutting the presumption of undue influence is supported by substantial evidence
As explained previously, once the trial court found that Thompson was a "care custodian of a dependent adult," the burden shifted to Thompson to prove by clear and convincing evidence, excluding his own testimony, that the transfer was not the product of fraud, menace, duress or undue influence. (§§ 21350(a)(6), 21351(d).) The court found that Thompson had not met that burden. Thompson does not contest this finding in his opening brief. An appellate court has the discretion to disregard issues not properly addressed in the briefs, effectively treating them as having been abandoned. (Tiernan v. Trustees of Cal. State University & Colleges (1982) 33 Cal.3d 211, 216, 188 Cal.Rptr. 115, 655 P.2d 317.)
In addition to opposing Thompson's petition on the ground that he was disqualified under section 21350, the public administrator and Bunning attacked the trust on the grounds of common law undue influence. The public administrator also argued that the trust was invalid because Thompson had forged Shinkle's signature on the trust. In its statement of decision, the trial court said: "Because this Court has determined that Mr. Thompson is disqualified pursuant to Probate Code section 21350, it is unnecessary for the Court to address the two remaining arguments of the Public Administrator and Contestant...." In its respondent's brief on appeal, the public *56 administrator urges this court to set aside the trust on the grounds of common law undue influence. The public administrator also asserts that "[e]ven though the trial court did not make an explicit finding that the trust was invalid because Shinkle did not sign it, this Court nevertheless may uphold the judgment on that ground."
Thompson responds to both of these arguments in his reply brief. He argues that there was no common law undue influence and that the testimony of the handwriting expert was prejudicial and inaccurate. However, he never addresses the issue of the propriety of the trial court's ruling that he did not meet his burden of rebutting the presumption of undue influence created by section 21351(d). As noted above, we have the discretion to treat this issue as abandoned. But since the question is related to the common law theory of undue influence, which the parties did brief, we shall address it.
The trier of fact determines whether the burden of rebutting a presumption has been satisfied. (Estate of Auen (1994) 30 Cal.App.4th 300, 312, 35 Cal.Rptr.2d 557.) "We review the trial court's finding that [Thompson] failed to rebut the presumption of undue influence under the substantial evidence rule like any other issue of fact." (Id. at p. 313, 35 Cal. Rptr.2d 557)
The trial court discussed Thompson's rebuttal evidence in detail in its statement of decision. Pursuant to section 21351(d), Thompson's evidence had to be clear and convincing and he could not rely on his own testimony. The trial court concluded that Thompson's evidence was not clear and convincing. The court found that Thompson's key witness, Campbell, was not credible. The court observed that Campbell stood to gain financially by having Shinkle sign the trust and was therefore not in a position to notice any problems with Shinkle. The trial court also commented on the irregularities in the execution of the will and concluded that Campbell's statements under penalty of perjury were a "deliberate and blatant lie." The court found the testimony of Shinkle's treating physician, who did not find her to be either mentally incapacitated or a dependent person, to be of minimal probative value, given the doctor's lack of expertise in geriatric medicine and his minimal contact with Shinkle. The other witness Thompson relied on, a social worker with Adult Protective Services, had seen Shinkle only once for approximately 15 minutes. Substantial evidence supports the trial court's conclusion that Thompson failed to rebut the presumption of undue influence.
In light of our holding, we do not reach the respondent's arguments regarding common law undue influence or the forgery allegation.
One more point bears mentioning. Thompson asserts that if we interpret the phrase "care custodian" too broadly, it will discourage people from helping the elderly and will encourage a large number of lawsuits by persons who feel they have been unjustly denied their inheritances. Even if an individual is disqualified from receiving a transfer under section 21350(a), the transfer may still be deemed valid if the conditions set forth in section 21351 are met. (For the full text of § 21351, see fn. 3.) In this case, Thompson could have avoided the prohibition of section 21350 by having the trust reviewed by an independent attorney who counseled Shinkle about the nature of her intended transfer and executed a certificate of independent review. (§ 21351, subd. (b).) Thompson never suggested Shinkle see an attorney. In addition, under the statutory scheme, Thompson would have been able to inherit from Shinkle if he had successfully rebutted *57 the presumption of undue influence. (§ 21351(d).)

DISPOSITION
The judgment of the trial court is affirmed.
WE CONCUR: WUNDERLICH and O'FARRELL, JJ.[*]
NOTES
[1] Unless otherwise stated, all further statutory references are to the Probate Code.
[2] After Thompson's notice of appeal was filed, the trial court ordered him to pay the public administrator and its counsel $114,566.49 in costs and attorney's fees.
[3] Section 21351 provides: "Section 21350 does not apply if any of the following conditions are met: [11] (a) The transferor is related by blood or marriage to, or is a cohabitant with, the transferee or the person who drafted the instrument. This subdivision shall retroactively apply to an instrument that becomes irrevocable on or after July 1, 1993. [¶] (b) The instrument is reviewed by an independent attorney who (1) counsels the client (transferor) about the nature of his or her intended transfer and (2) signs and delivers to the transferor and the drafter a certificate in substantially the following form:
 `CERTIFICATE OF INDEPENDENT REVIEW
I,___________________________________________________________, have reviewed
 (attorney's name)
___________________________________________________________ and counseled my client,
 (name of instrument)
_________________________________________________________, on the nature of the transfer, or
 (name of client)
transfers, of property to __________________________________________________________________________
 (name of potentially disqualified person)
contained in such instrument. I am so disassociated from the interest of the transferee as to be in a
position to advise my client impartially and confidentially as to the consequences of the transfer. On the
basis of this counsel, I conclude that the transfer, or transfers, in such instrument that otherwise might be
invalid under Section 21350 of the Probate Code are valid because such transfer, or transfers, are not the
product of fraud, menace, duress, or undue influence.
_____________________________________________ ______________________________________________________________
 (Name of Attorney) (Date)
Any attorney whose written engagement signed by the client is expressly limited solely to the
preparation of a certificate under this subdivision, including the prior counseling, shall not be
considered to otherwise represent the client. [¶] (c) After full disclosure of the relationships of the
persons involved, the instrument is approved pursuant to an order under Article 10 (commencing with
Section 2580) of Chapter 6 of Part 4 of Division 4. [¶] (d) The court determines, upon clear and
convincing evidence, excluding the testimony of any person described in subdivision (a) of Section
21350, that the transfer was not the product of fraud, menace, duress, or undue influence. If the court
finds that the transfer was the product of fraud, menace, duress, or undue influence, the disqualified
person shall bear all costs of the proceeding, including reasonable attorney's fees. [¶] (e) Subdivision (d)
shall apply only to the following instruments: [¶] (A) Any instrument executed by a person who was not
a resident of this state at the time the instrument was executed. [¶] (B) Any instrument other than one
making a transfer to a person described in paragraph (1) of subdivision (a) of Section 21350. [¶] (C)
Any instrument executed on or before July 1, 1993, by a person who was a resident of this state at the
time the instrument was executed. [¶] (f) The transferee is a federal, state, or local public entity, an
entity that qualifies for an exemption from taxation under Section 501(c)(3) or 501(c)(19) of the
Internal Revenue Code, or a trust holding an interest for this entity, but only to the extent of the interest
of the entity, or the trustee of this trust. This subdivision shall retroactively apply to an instrument that
becomes irrevocable on or after July 1, 1993. [¶] (g) For purposes of this section, `related by blood or
marriage' shall include persons within the seventh degree."

[4] Section 21350.5 provides: "For purposes of this part, `disqualified person' means a person specified in subdivision (a) of Section 21350, but only in cases where Section 21351 does not apply."
[5] Section 21353 provides: "If a transfer fails under this part, the transfer shall be made as if the disqualified person predeceased the transferor without spouse or issue, but only to the extent that the value of the transfer exceeds the intestate interest of the disqualified person."
[*] Judge of the Monterey Superior Court assigned by the Chief Justice Pursuant to article VI, section 6 of the California Constitution.