[No. A098625. First Dist., Div. Three. Nov. 26, 2003.]

Conservatorship of the Estate of DOLORES DAVIDSON.
CAL MORKEN, Petitioner and Appellant, v.
STEPHEN GUNGL, Objector and Respondent.

### Counsel

Law Office of John Halley and John A. W. Halley for Petitioner and Appellant.

Law Offices of Norman E. Reitz, Norman E. Reitz, Howard L. Hibbard and Jon A. Nakanishi for Objector and Respondent.

### Opinion

McGUINESS, P. J.—This appeal is from a judgment affirming the validity of the revocable living trust of conservatee and decedent Dolores Davidson, and denying the petition of appellant Cal Morken to invalidate that trust and rescind the gift thereunder to respondent Stephen Gungl. Appellant Morken contends the trial court erred in upholding Davidson's gift to Gungl as valid under the provisions of Probate Code sections 21350 and 21351, based upon the determination that respondent Gungl was not a "care custodian of a dependent adult" barred from receiving a donative transfer under Probate Code section 21350, subdivision (a)(6).[1] Respondent Gungl argues that the trial court's determination that he was not a "care custodian" under the statute was supported by substantial evidence; the judgment is supported by clear and convincing evidence that the transfer to Gungl was not the product of fraud, menace, duress or undue influence; and there was no presumption of undue influence under the circumstances of this case.

We conclude the trial court correctly determined that for purposes of section 21350, respondent Gungl was not a "care custodian" providing "health services or social services" to Davidson. The record amply supports the trial court's finding that the care and companionship Gungl rendered to Davidson in her declining years was the natural outgrowth of a genuinely close personal relationship which preexisted by many years the caregiving role which Gungl assumed as Davidson grew older. We similarly find substantial evidence to support the trial court's determination, made on the basis of clear and convincing evidence, that Davidson's gift of her estate to Gungl was not a product of undue influence. Based on the law, interpreted in light of the particular facts and circumstances of this case, we therefore affirm the judgment.

### Factual and Procedural Background

The underlying dispute is between beneficiaries of a revocable living trust instrument and will executed in 1996, by means of which Davidson left the

---

[1] Unless otherwise indicated, all further statutory references are to the Probate Code.

bulk of her estate to Gungl and simultaneously revoked an earlier will executed in 1990, of which Davidson's cousin Elaine Morken, the wife of appellant Morken, was the principal beneficiary. Elaine Morken, the daughter of Davidson's mother's sister, died on January 15, 2000. Davidson herself, who died on June 17, 2000 at the age of 95, was an only child and had no children. Her own husband had passed away in the late 1970's.

Gungl met Davidson and her husband at a party in 1962, after which he gave them occasional lessons on the electric organ at the Davidsons' home. Over the years, Gungl became close friends with the Davidsons. Gungl and the Davidsons were residents of San Mateo County, and frequent visitors in each other's respective homes. Gungl attended the Davidsons' birthday and anniversary celebrations, and entertained them in his own home for Thanksgiving, Christmas, and other occasions. Gungl also attended the memorial service for Davidson's husband after the latter's death. To the best of Gungl's knowledge, neither appellant Morken nor his wife, Davidson's cousin, was present on any of these occasions. After the death of Davidson's husband, Gungl made a point of visiting Davidson more often, taking her on drives and to dinner, and helping her out with household chores. After Davidson stopped driving altogether around 1990, Gungl became Davidson's primary provider of transportation.

Howard Holtz was Gungl's long-time partner. At the time of trial in 2001, Holtz and Gungl had lived together since 1966. Over the years, Holtz also befriended Davidson, and the three became very close. Davidson treated Gungl and Holtz like her family, and referred to them as "her boys." The close, loving, and almost filial relationship between Gungl and Davidson was obvious to friends and neighbors of Davidson.

On November 12, 1990, Davidson executed a will leaving the bulk of her estate to appellant Morken and his wife, with a number of specific bequests to other individuals. This will included a gift to Gungl of $1,000, together with her Hammond organ, a speaker, "the large desk and chair in the office of my late husband," and "any other musical instruments in the downstairs rumpus room of my home he may want." In addition, Davidson specified Gungl as the executor of her will. Elaine Morken and her husband, appellant, were nominated as co-executors "[i]n the event [Gungl was] unwilling or unable to serve as such executor."

In February 1992, Davidson became very sick and was hospitalized for some time. Nurses' notations made at the time indicated that Davidson presented some symptoms of confusion, forgetfulness and disorientation. After her hospitalization, her physical and mental condition deteriorated. Maria Barreneche, Davidson's paid house cleaner and helper, testified that

Davidson was "not right" mentally, unable to remember things, frequently repeated herself, and required help to cook and bathe herself. Davidson's old friend and neighbor Muriel Vint, who had known Davidson since high school and traveled with her several times, testified that she began noticing Davidson's mental decline around 1995, when Davidson could not at first remember Vint's name and some of the pictures of her previous travels. However, Davidson was able to talk with Vint about their trips together. Vint opined that the assistance provided to Davidson by her "boys," Gungl and Holtz, enabled her to live independently at home. Vint testified that Gungl and Holtz took "beautiful care" of Davidson's home.

Sviatsoslav Yasinitsky, a former police inspector, had retired from a position as director of public safety at the University of San Francisco. He was a neighbor of Davidson's since approximately 1959, and knew her well. In his opinion, Davidson was not suffering from dementia in 1996, but merely getting old. Yasinitsky confirmed that Davidson manifested great affection for respondent Gungl over the years, habitually referred to him as "my boy," and treated both Gungl and Holtz as if they were her sons.

As Davidson became increasingly enfeebled by age and infirmity, Gungl and Holtz assumed more and more of the responsibility of caring for her. They cooked for her, shopped for her, and drove her when she needed to go out of her house to the doctor or for other appointments. In March 1993, Davidson executed a document giving Gungl a power of attorney. Thereafter, Gungl had Davidson's mail sent to his house, paid her bills, and took care of her banking.

Between September and November 1995, Gungl met with Judy Reilly, an employee of the Alliance for Mature Americans (AMA), to set up a living trust for himself. Gungl also had the AMA draw up a living trust for his own mother. Thereafter, Gungl contacted Reilly to have her meet with Davidson to discuss creating a living trust for Davidson. Reilly came to Davidson's home and met with her on November 2, 1995, for two to three hours. Also present at this meeting were Gungl and his friend Lynn Deauville. According to the testimony of Deauville and Reilly, Reilly discussed how the trust worked, explaining how it was easier than a will to revoke or change, gave her more immediate control of her assets, and avoided probate. Davidson asked Reilly pertinent questions, and it appeared to Reilly that Davidson was able to comprehend and follow the discussion. Davidson told Reilly that she wanted Gungl to have everything. When Gungl asked Davidson, "[w]hat about the Morkens," she replied that she "had no idea" what to leave them but she "did not want to leave them very much." When he suggested leaving them $5,000, Davidson said: "That's too much." Reilly and Gungl testified that Gungl and Deauville were not in the room when Reilly and Davidson discussed the specific details of who the trust beneficiaries would be.

On January 19, 1996, Douglas Day, a notary and trust planner for AMA, came to Davidson's residence with the completed trust and pour-over will documents as prepared by AMA. Day explained the trust to Davidson, and went over the specific provisions relating to trustees, successor trustees, and beneficiaries. He then witnessed and notarized her signatures on the documents. Davidson signed or initialed each page, indicating that she understood who the trustees and beneficiaries of the trust were. Day testified on the basis of his experience as a trust planner who had handled approximately a thousand living trusts that Davidson appeared to be of sound mind, and there did not appear to be any undue influence on her to execute the documents. Day testified that he had previously refused to notarize trust documents when he had reason to question the capacity of the individual in question. Deauville, who was also present on this occasion, testified that Davidson told Day she did not sign anything without reading it first, so Day handed her the pages of the trust one at a time to give her time to read and sign each page. Davidson wore her reading glasses for the purpose.[2]

The trust instrument provided that Davidson was settlor, initial trustee and primary beneficiary of the trust. As settlor and initial trustee, Davidson named Gungl as both first successor trustee to herself, and as sole successor beneficiary. The trust instrument specified that upon Davidson's death, Gungl was to distribute several specific bequests, including one of $5,000 to "Elaine Morken and her husband." Thereafter, Gungl would succeed to a "100.00%" interest in the trust estate. The pour-over will, in turn, provided that upon Davidson's death, all of her personal and residual property would go to the trustee (Gungl) to be administered as part of the trust, with Gungl also nominated as executor. Together, by the trust instrument and pour-over will executed on January 19, 1996, Davidson effectively gave the bulk of her estate to Gungl upon her death.

Appellant Morken became acquainted with Davidson through his wife, Davidson's cousin. After living in South Dakota, Minnesota and Illinois, Morken and his wife moved to San Diego, California in 1988. Thereafter, Morken estimated that he saw Davidson "[t]wo or three or four times" a year, although not staying at her home. Prior to 1991, Morken was not concerned about Davidson's ability to care for herself. Up until 1996, Morken did not notice anything "special" or unusual about Davidson's condition during his visits. Morken never objected to Gungl's close personal involvement in caring for Davidson; to the contrary, he counted on Gungl to take care of her, "[b]ecause she had named him executor of her will and he was a friend and she said she trusted him completely." According to the testimony of Deauville, Davidson was not fond of Morken or his wife. She expressed fear that

---

[2] Appellant testified that Davidson had worked in a private law office in the past.

they would place her in the "booby hatch," or move into her house themselves in order to exert control over her. Morken did not make any inquiries into or consult anyone about Davidson's mental and physical condition until after he learned in August 1996 that she had executed a new trust instrument and will.

Morken's son, Scott, was a case worker for the Department of Health and Human Services in San Diego. By virtue of his employment, Scott Morken was a "mandated reporter," required to report suspected cases of elder abuse. Between 1990 and 1996, Scott Morken visited Davidson two or three times a year. During this time, he never reported any aspect of Davidson's condition or care by Gungl for suspected elder abuse.

Contact between Davidson and appellant Morken and his wife was relatively infrequent until after they learned that Davidson had executed the trust. Thereafter, the Morkens initiated a succession of complaints to San Mateo County Adult Protective Services, calls to the police, visits to Davidson and inquiries to her neighbors. Ultimately, Davidson was placed in a conservatorship under the charge of the San Mateo County Public Guardian, her house was sold, and she was placed in a nursing home in Redwood City where she declined and died.[3]

In July 1998, Davidson was evaluated by Dr. Matthew Bowen, a forensic neuropsychologist who had been retained by the San Mateo County Public Guardian to evaluate Davidson's mental competency. Dr. Bowen found that although Davidson was declining in mental acuity, she was both clear and forceful in expressing her desire that her estate go to Gungl and Holtz and not to her cousins the Morkens, whom she said "just want what I've got when I kick the bucket." Based on his observations of Davidson in a neutral setting, Dr. Bowen concluded: "In my opinion she has maintained the capacity to convey an independently generated, reliable opinion as to her desires regarding beneficiaries."[4]

---

[3] Yasinitsky, Davidson's neighbor and friend of many years, did not even know of the existence of appellant Morken until 1998, when Morken and his wife came to his home and asked him about Davidson's behavior and condition. At that time, Yasinitsky was surprised to hear Mrs. Morken say that Davidson's house would pay for her son's education. Yasinitsky testified to his impression of appellant and his wife as follows: "Their sudden appearance was a shock and concern, especially their actions that caused this old woman to be moved out of her lawful residence where she expected to live out her last years[,] and their persistent efforts to keep . . . Gungl and Holtz away from [her]. The only result of the Morkens' actions [has] been obvious disregard for [Davidson's] happiness."

[4] In pertinent part, Dr. Bowen's report described Davidson as follows: "A very elderly woman, still relatively robust physically, but with moderate-severe (probable) Alzheimer's dementia. As a result she is entirely unable to comprehend her financial affairs and as such is vulnerable to fraud and undue influence. She is unable to provide informed medical consent. In

At trial, several expert witnesses gave conflicting testimony regarding Davidson's mental condition from 1994 through 1998, a period for which there were no written medical records. Appellant's expert, psychologist Dr. Alfred Fricke, testified, based on his interpretation of Dr. Bowen's findings, that Davidson likely suffered from Alzheimer's disease with resulting anxiety, confusion and dependency. Dr. Fricke opined that Davidson lacked testamentary capacity in 1996, and was "very, very vulnerable [and] susceptible" to the undue influence of caretakers. However, Dr. Fricke admitted that Davidson was still living independently in November 1996, 10 months after execution of the trust; that even if she had Alzheimer's disease, there would still be periods of lucidity; and that Bower's report suggested Davidson herself believed that appellant and his wife were just after her money. Dr. Fricke could give no opinion as to whether there actually was any undue influence exercised on Davidson. He acknowledged that he himself had no schooling or clinical work in geriatrics; only 1 percent of his entire practice involved geriatric patients; he did not review the testimony of the percipient witnesses to Davidson's condition at the time of execution of the trust; and he never interviewed Dr. Bowen.

Respondent Gungl's expert witness was Dr. Marvin Firestone, a neuropsychiatrist board certified in geriatric forensic psychiatry, with a law degree, who was director of a brain injury and Alzheimer's evaluation program and author of numerous articles and a book on these subjects. In preparation for his testimony, Dr. Firestone reviewed all of Davidson's medical records and neuropsychological reports; interviewed the pertinent witnesses; reviewed the diary of Lynn Deauville, who had lived with Davidson in late 1996 to help take care of her; and spoke with Dr. Bowen and reviewed his written report. Dr. Firestone concluded that Davidson had the requisite mental capacity to form a valid testamentary intent in January 1996, when the subject trust was executed; she knew what she was doing when she executed the trust and pour-over will; she was not susceptible to undue influence; and there was no actual undue influence exercised on her at the time she did so. On this basis, Dr. Firestone concurred with Dr. Bowen's opinion that Davidson retained sufficient emotional and mental capacity to form an independently generated testamentary intent, and to express that intent in January 1996 with regard to the beneficiaries of her trust.

On August 3, 2000, appellant filed a petition seeking an order invalidating the trust executed by Davidson and rescinding the gift to Gungl, on the grounds that (1) at the time the revocable living trust was executed in January

my opinion she has maintained the capacity to convey an independently generated, reliable opinion as to her desires regarding beneficiaries. It is not inconsistent for a patient with advanced dementia to maintain a fundamental awareness of more emotionally based thoughts, versus the loss of reliable mentation for material of a strictly cognitive nature, such as monetary details."

1996, Davidson lacked the requisite mental capacity to execute such an instrument; (2) the trust instrument was prepared and executed under Gungl's undue influence, and (3) Gungl was a care custodian barred by section 21350 from benefiting from a donative transfer. The San Mateo County Public Guardian, previously ordered by the court to serve as successor trustee of the contested trust, filed a notice that it did not oppose the granting of appellant's petition.

The petition was tried to the court. On July 11, 2001, at the conclusion of trial, the trial court orally announced its decision denying the petition. On October 26, 2001, the trial court issued a statement of decision and judgment. Among other things, the trial court found that: Davidson's living trust was validly prepared and executed; Davidson was not subject to undue influence or mistake when she executed the trust in January 1996; Davidson had the requisite testamentary capacity at the time she executed the trust; Gungl did not qualify as a "care custodian" for purposes of section 21350, and was therefore not barred from receiving a donative transfer under Davidson's trust; Gungl's testimony was credible; Gungl's concern for Davidson was deep, genuine and of very long duration; any money paid by Davidson to Gungl was for the direct benefit of Davidson herself and to cover Gungl's own out-of-pocket expenses for her care; and even though Gungl was not a blood relative of Davidson, he was a "more obvious" object of her testamentary disposition than appellant. On the basis of these findings, the trial court found Davidson's living trust valid, and ordered that the disposition and bequests set out therein be honored and carried out by the Public Guardian of San Mateo County. This appeal timely followed.

## RESPONDENT NOT BARRED AS "CARE CUSTODIAN"

Appellant first contends that the trial court erred in determining that Gungl was not a "care custodian" under section 21350. There was no error.

Section 21350, subdivision (a) provides in pertinent part as follows: "Except as provided in Section 21351, no provision, or provisions, of any instrument shall be valid to make any donative transfer to any of the following: [¶] . . . [¶] (6) A care custodian of a dependent adult."[5] As provided

---

[5] Section 21350 provides in pertinent part as follows: "(a) Except as provided in Section 21351, no provision, or provisions, of any instrument shall be valid to make any donative transfer to any of the following: [¶] (1) The person who drafted the instrument. [¶] (2) A person who is related by blood or marriage to, is a cohabitant with, or is an employee of, the person who drafted the instrument. [¶] (3) Any partner or shareholder of any law partnership or law corporation in which the person described in paragraph (1) has an ownership interest, and any employee or any such law partnership or law corporation. [¶] (4) Any person who has a fiduciary relationship with the transferor, including, but not limited to, a conservator or trustee,

by section 21350, subdivision (c), the terms "care custodian" and "dependent adult" are defined by Welfare and Institutions Code sections 15610.17 and 15610.23, respectively. Section 21351 in turn provides that the bar of section 21350 does not apply if the transferor is related by blood or marriage to the transferee, the instrument is reviewed and approved by an independent attorney who counsels the transferor and signs a certificate of independent review, the instrument is approved by a court after full disclosure in a special proceeding, or the court finds by clear and convincing evidence—without reference to the testimony of the disqualified person—that the transfer was not procured by fraud, menace, duress, or undue influence. (§ 21351, subds. (a)–(d).)[6]

Under the pertinent statutory definition, " 'Care custodian' means an administrator or an employee of any of the following public or private facilities or agencies, or persons providing care or services for elders or dependent adults, including members of the support staff and maintenance staff: [¶] . . . [¶] (y) Any . . . protective, public, sectarian, mental health, or private assistance or advocacy agency or person providing health services or social services to elders or dependent adults." (Welf. & Inst. Code, § 15610.17.) "Dependent adult" in turn is defined in pertinent part as follows: "any person between the ages of 18 and 64 years who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities, or whose physical or mental abilities have diminished because of age." (Id.,

---

who transcribes the instrument or causes it to be transcribed. [¶] (5) A person who is related by blood or marriage to, is a cohabitant with, or is an employee of a person who is described in paragraph (4). [¶] (6) A care custodian of a dependent adult. [¶] . . . [¶] (c) For purposes of this section, the term 'dependent adult' has the meaning set forth in Section 15610.23 of Welfare and Institutions Code and also includes those persons who (1) are older than age 64 and (2) would be dependent adults, within the meaning of Section 15610.23, if they were between the ages of 18 and 64. The term 'care custodians' has the meaning set forth in Section 15610.17 of Welfare and Institutions Code."

[6] Section 21351 provides in pertinent part as follows: "Section 21350 does not apply if any of the following conditions are met: [¶] (a) The transferor is related by blood or marriage to, is a cohabitant with, or is the registered domestic partner . . . of the transferee or the person who drafted the instrument. . . . [¶] (b) The instrument is reviewed by an independent attorney who (1) counsels the client (transferor) about the nature and consequences of the intended transfer, (2) attempts to determine if the intended consequence is the result of fraud, menace, duress, or undue influence, and (3) signs and delivers to the transferor an original certificate [of independent review]. [¶] . . . [¶] (c) After full disclosure of the relationships of the persons involved, the instrument is approved pursuant to [a court] order . . . . [¶] (d) The court determines, upon clear and convincing evidence, but not based solely upon the testimony of any person described in subdivision (a) of Section 21350, that the transfer was not the product of fraud, menace, duress, or undue influence. If the court finds that the transfer was the product of fraud, menace, duress, or undue influence, the disqualified person shall bear all costs of the proceeding, including reasonable attorney's fees."

§ 15610.23.) Under section 21350, subdivision (c), this latter definition specifically "also includes those persons who (1) are older than age 64 and (2) would be dependent adults, within the meaning of [Welfare and Institutions Code] Section 15610.23, if they were between the ages of 18 and 64."

In determining whether section 21350 barred the donative transfers to Gungl under Davidson's living trust and pour-over will, the trial court did not specifically address the issue of whether Davidson constituted a "dependent adult" for purposes of the statute. However, there is little doubt, either from the findings the trial court did make or the extensive evidence about Davidson in the trial record, that Davidson came within the statutory definition of a "dependent adult." Although the trial court found that Davidson was still "remarkably physically able," knew she owned her own home, was aware of who her friends and relatives were, was not subject to undue influence, "exercised her own free will" in executing the trust documents, and "had the requisite testamentary capacity" at the time she executed the trust in January 1996, it also determined that she was of "advanced years," "diminishing mental capacity," had exhibited "severe diminishment" on tests, and "was forgetful, old, perhaps eccentric and arguably of filthy personal habits." Unquestionably, Davidson was a person "older than age 64" whose physical or mental abilities had "diminished because of age," thereby restricting her "ability to carry out normal activities or to protect his or her rights." (§ 21350, subd. (c); Welf. & Inst. Code, § 15610.23) Respondent does not dispute that Davidson qualified as a "dependent adult" for purposes of section 21350.

With regard to its determination that Gungl was not a "care custodian" for purposes of the statute, the trial court cited Gungl's absence of occupational experience or professional employment in the provision of health care or social services; the remarkably long and close relationship between Davidson and Gungl; Gungl's deep personal concern for Davidson's well-being; the noncommercial nature of the personal care he offered her; and the fact that the monies paid to Gungl were not remuneration, but instead were for her direct personal benefit and to cover Gungl's out-of-pocket expenses on Davidson's care. Appellant rejects the premise of the trial court's reasoning. He cites the language of Welfare and Institutions Code section 15610.17, which includes within the definition of "care custodian" "*persons* providing *care or services* for elders or dependent adults" and "[a]ny other . . . *private . . . person* providing health services or social services to elders or dependent adults." (Welf. & Inst. Code, § 15610.17, subd. (y), italics added.) Based on this statutory language, appellant argues that Gungl fits within the definition of a "private" care custodian, regardless of the fact he was not regularly employed in the health care or social services industries, or specifically hired to provide health care or social services to Davidson.

We reject appellant's overbroad interpretation of the pertinent statutory language. Under appellant's reading of section 21350 and Welfare and Institutions Code section 15610.17, virtually *any* individual providing personal care to a dependent adult, no matter how intimately and personally connected they might be, would be disqualified from receiving a gift, bequest, devise, or other donative transfer from the dependent adult under a trust or will unless they were related to the dependent by blood or marriage. Appellant's interpretation of "care custodian" is so broad as to include not only the provision of health care or social services, but such acts as simply cooking for an elderly person, driving a house-bound individual to the bank or doctor, or going shopping for them. Indeed, appellant specifically cites Gungl's provision of just these services to Davidson as evidence that he was a "care custodian" under the statute.

In so doing, appellant's interpretation does violence not only to traditional principles of private charity and contemporary societal structures and relationships, but to the explicit language of the relevant statutes. The definition of "care custodian" in Welfare and Institutions Code section 15610.17, incorporated by reference in section 21350, clearly focuses on the *occupational* provision of *"health services and social services"* (italics added) by specifically enumerated public agencies and private professional organizations and individuals.[7] The kind of personal, nonprofessional care provided

---

[7] The lengthy list of agencies and professions included in the statutory definition of "care custodian" includes "(a) Twenty-four-hour health facilities . . . . [¶] (b) Clinics. [¶] (c) Home health agencies. [¶] (d) Agencies providing publicly funded in-home supportive services, nutrition services, or other home and community-based support services. [¶] (e) Adult day health care centers and adult day care. [¶] (f) Secondary schools that serve 18- to 22-year-old dependent adults and postsecondary educational institutions that serve dependent adults or elders. [¶] (g) Independent living centers. [¶] (h) Camps. [¶] (i) Alzheimer's Disease day care resource centers. [¶] (j) Community care facilities . . . . [¶] (k) Respite care facilities. [¶] (l) Foster homes. [¶] (m) Vocational rehabilitation facilities and work activity centers. [¶] (n) Designated area agencies on aging. [¶] (o) Regional centers for persons with developmental disabilities. [¶] (p) State Department of Social Services and State Department of Health Services licensing divisions. [¶] (q) County welfare departments. [¶] (r) Offices of patients' rights advocates and clients' rights advocates, including attorneys. [¶] (s) The office of the long-term care ombudsman. [¶] (t) Offices of public conservators, public guardians, and court investigators. [¶] (u) Any protection or advocacy agency or entity that is designated by the Governor to fulfill the requirements and assurances of the following: [¶] (1) The federal Developmental Disabilities Assistance and Bill of Rights Act of 2000, . . . for protection and advocacy of the rights of persons with developmental disabilities. [¶] (2) The Protection and Advocacy for the Mentally Ill Individuals Act of 1986, . . . for the protection and advocacy of the rights of persons with mental illness. [¶] (v) Humane societies and animal control agencies. [¶] (w) Fire departments. [¶] (x) Offices of environmental health and building code enforcement. [¶] (y) Any *other* protective, public, sectarian, mental health, or private assistance or advocacy agency or person *providing health services or social services* to elders or dependent adults." (Welf. & Inst. Code, § 15610.17, italics added.)

by Gungl to Davidson may be brought within the scope of the subject statutes only by severely editing the statutory language.

The undisputed record shows that the assistance offered by Gungl and Holtz to Davidson consisted of cooking, gardening, driving her to the doctor, running errands, grocery shopping, purchasing clothing or medications, and assisting her with banking. Unless this kind of assistance can be equated with "health services or social services," there is no evidence Gungl acted as a "care custodian" for Davidson. Indeed, the record supports the contrary conclusion. Up to the time she executed the trust in January 1996, Davidson administered her own medications and basically took care of herself, with some assistance from her housekeeper Barreneche. Thus, during the time period most relevant to this case, Davidson was still essentially maintaining her independence. It was not until approximately April 1998 that Davidson declined to the point that she required more sustained, around-the-clock care and assistance. The primary reason the San Mateo County Public Guardian thereafter took Davidson out of her home and placed her in a 24-hour care facility was because of Davidson's need to receive this higher level of more intensive health and social care. In short, the kinds of errands, chores, and household tasks performed by Gungl for and on Davidson's behalf simply cannot be equated with the provision of "health services and social services" specified by the subject statutes as constituting custodial care. Even if the kind of unsophisticated care and attention that Gungl provided to Davidson could be described as constituting health and social services, it is undisputed that Gungl had no professional expertise or occupational experience in providing such services. For these reasons alone, Gungl did not qualify as a "care custodian" under section 21350 and Welfare and Institutions Code section 15610.17.

Moreover, appellant's interpretation of the statute is also contradicted by the legislative history, of which we take judicial notice.[8] As made clear by discussion of the legislation in an analysis prepared for the Senate Judiciary Committee, the enactment of the amendment adding "care custodians" to the list of presumptively invalid recipients of donative transfers was intended to apply to gifts made "to practical nurses or other caregivers hired to provide in-home care." (Sen. Com. on Judiciary, com. on Assem. Bill No. 1172 (1997–1998 Reg. Sess.) p. 4.) The original proponent of the proposal for the amendment was the Estate Planning Trust and Probate Law Section of the State Bar of California in its annual omnibus bill. In a document prepared by

---

[8] On January 28, 2003, respondent requested that we take judicial notice of the legislative history of the 1997 amendment to section 21350, which added subparagraph (6) to subdivision (a), prohibiting donative transfers to "[a] care custodian of a dependent adult," and adding subdivision (c) defining "care custodian" and "dependent adult." (Stats. 1997, ch. 724, § 33.) By order March 3, 2003, we deferred this request until our consideration of the merits of the appeal. We now grant the request for judicial notice.

that section discussing the proposed amendment, the "Purpose" of the amendment was described as "to prevent the growing 'cottage industry' of 'practical nurses' from successfully taking advantage of dementing elders." The "Application" of the amendment is similarly described: "This would . . . remove the incentives for the growing 'cottage industry' of 'practical nurses' to attempt to take advantage of dementing elders." (Cal. State Bar Estate Planning, Trust & Prob. Law Section, Legislative Proposal, Assem. Bill No. 1172, excerpted from Senate Com. on Judiciary legislative bill file.)

Thus, the legislative intent was to place limitations on the ability of *professional* "care custodians" to receive donative transfers from elderly testators. This intent is not advanced by imposing burdensome technical and procedural barriers on the ability of elderly individuals to recognize and reward services performed for them in their declining years by close personal friends, intimates and companions. It would be both tragic and ironic if the statute were interpreted so broadly as to result in effectively punishing such individuals for the self-sacrificing acts of care and companionship they provided to the aging. The trial court's interpretation of the term "care custodian" is clearly congruent with both the clear statutory language and the legislative intent to restrain potential abuses by persons employed in the health care and social services industries without effectively penalizing individuals performing private acts of charity.

In the recent case of *Estate of Shinkle* (2002) 97 Cal.App.4th 990 [119 Cal.Rptr.2d 42] (*Shinkle*), the Sixth District addressed the definition of a care custodian for purposes of section 21350. In *Shinkle*, an elderly dependent who had resided in a skilled nursing facility for almost three years executed a trust instrument making the long-term-care ombudsman for the facility the beneficiary of her trust. The definition of a "care custodian" who is prohibited from receiving a donative transfer under section 21350, subdivision (a)(6) specifically includes a "long-term-care ombudsman." (Welf. & Inst. Code, § 15610.17, subd. (s).) In *Shinkle*, the ombudsman claimed the trust was valid because he had been transferred to another facility six months before the trust was executed, the elderly dependent herself had been discharged from the facility a month and a half before she signed the trust, and he was therefore no longer in the formal relationship of long-term care ombudsman to her at the time she executed the instrument making the donative transfer to him. The Court of Appeal disagreed, holding that a health care ombudsman remains a "care custodian" within the meaning of the statute even after his or her formal fiduciary and professional association with the elderly client has ended—due either to a change in the ombudsman's facility assignment or the fact that the dependent elder has left the facility—when as a direct conse-quence of that fiduciary relationship the ombudsman gains the elderly client's trust, acquires personal and financial information about the client, and eventually develops a personal relationship with the dependent elder as a

result of which the ombudsman is named the beneficiary of a donative transfer in the elder's trust or will. (*Shinkle, supra,* 97 Cal.App.4th at pp. 992–993, 1007.)[9]

*Shinkle* is both distinguishable from this case and instructive to our analysis. In *Shinkle,* the holding of the appellate court was based on the fact the trust beneficiary's personal relationship with the dependent elder arose directly out of his preexisting professional and fiduciary connection to her as the long-term care ombudsman at her elder care residential facility, which in turn enabled him to secure her trust and gain access to her personal financial information. There was no evidence at all that the ombudsman had any personal relationship with the dependent elder unconnected with his professional position as ombudsman, even though that formal connection ceased some months before the donative instrument was executed. But for the fact the beneficiary first served in the professional capacity of the dependent elder's long-term health care ombudsman, he would never have developed any personal relationship with her. In stark contrast with *Shinkle,* the record in this case shows that Gungl's close personal relationship with Davidson was extremely long-standing, and had nothing to do with any previous professional health-care-related association. Only after years of personal friendship with Davidson did Gungl assume the *additional* role of caregiver to her.

■ Applying the reasoning of *Shinkle* to the facts of our case, and drawing upon the legislative history of section 21350, we hold that the statute bars donative transfers to individuals who have assumed the role of "care custodian" to a dependent adult incidental to the professional or occupational provision of health or social services to that dependent adult, rather than in connection with a personal or familial relationship; and whose personal relationship, if any, with the dependent adult is entirely incidental, secondary to, and derived from the preexisting professional or occupational connection. By the same token, we hold that when an individual becomes what is in effect a care custodian of a dependent adult as a direct result of a preexisting

---

[9] "[The ombudsman's personal] relationship with [the dependent elder] arose out of his volunteer work as an ombudsman. But for the ombudsman program, [he] would not have met [her], would not have had access to her financial and personal information, and would not have gained her trust. He would not have learned that she had few friends and no contact with her family. [The ombudsman] was a 'care custodian' under Probate Code section 21350[, subdivision] (a)(6) and Welfare and Institutions Code section 15610.17 while he served as [the dependent elder's] ombudsman . . . . [His] work as an ombudsman, as a 'care custodian' under section 21350[, subdivision] (a)(6), enabled him to gain access to [the dependent elder] and to gain her confidence. [¶] . . . [¶]

". . . Both the program director and another volunteer ombudsman testified that [the ombudsman's] conduct in befriending [the dependent elder], paying her bills and doing her banking was inappropriate for an ombudsman. These were the very activities that allowed [him] to gain [her] trust and information about her financial affairs." (*Shinkle, supra,* 97 Cal.App.4th at pp. 1006–1007.)

genuinely personal relationship rather than any professional or occupational connection with the provision of health or social services, that individual should *not* be barred by section 21350 from the benefit of donative transfers unless it can otherwise be shown that the subject transfer was the result of undue influence, fraud or duress. In every case, the issue is whether the role of care custodian served as the primary basis of any other more personal relationship, or vice versa. This interpretation of the term "care custodian" as used in section 21350 achieves the prophylactic purpose of the statute by protecting dependent adults from the predatory practices of individuals who misuse their professional positions to obtain personal favors, without doing violence to those authentic personal relationships in which care giving is the natural outgrowth of long-standing friendship, affection and genuine charity.

Appellant argues that, even if the term "care custodian" is interpreted to apply only to persons whose personal relationship with the dependent adult arises from the occupational provision of health or social services, Gungl should still be barred from recovering under Davidson's trust and will because of the remuneration he received for her care. Citing evidence of such payments made to Gungl, as reported in connection with the evidentiary hearing and accounting in Davidson's earlier conservatorship proceeding (San Mateo County Superior Court Case No. 103876), appellant urges that Gungl "was compensated" by Davidson, "and that he in fact provided [her] care for money."[10] On this basis, appellant contends that Gungl should be statutorily barred from recovering under Davidson's trust and will even if the term "care custodian" is interpreted to apply only to paid, professional care providers, because he was indisputably paid, and there is no substantial evidence to support the trial court's conclusion that all the monies he received "were for the direct benefit" of Davidson.

■ As seen, the language, legislative history and appellate interpretation of the relevant statutes combine to show that the term "care custodian" applies to individuals whose relationship with the dependent adult is incidental to the occupational provision of "health services or social services." (Welf. & Inst. Code, § 15610.17, subd. (y); *Shinkle, supra,* 97 Cal.App.4th at

---

[10] Although appellant made reference to this earlier evidentiary hearing and accounting in both his opening and reply briefs, he failed to include the pertinent documents in the appellate record or give an adequate citation which would enable this court to obtain and examine them, contrary to the requirements of the California Rules of Court. (Cal. Rules of Court, rules 14(a)(1)(C), 18(a).) Late on the afternoon of November 18, 2003, the eve of oral argument and more than a year after filing his opening brief in this appeal, appellant for the first time submitted a request for judicial notice of the "Statement of Decision and Judgment After Specially-set Evidentiary Hearing in Re: Order to Show Cause, Accounting and Surcharge," issued on October 6, 1999, in the earlier Davidson conservatorship proceeding (San Mateo County Superior Court Case No. 103876). Because the trial court took judicial notice of this document, we also grant judicial notice, permitting us to examine this material for the first time. (Evid. Code, § 459.)

pp. 992, 1006–1007.) The controlling question is whether the relationship between the caregiver and the dependent adult arose out of the provision of health or social services, or whether instead the provision of care developed naturally from a preexisting genuinely personal relationship. In making this determination, several factors are relevant and must be considered. These include (1) the length of time the individuals had a personal relationship before assuming the roles of caregiver and recipient; (2) the closeness and authenticity of the personal relationship; and (3) whether any money was paid for the provision of care. Each of these factors must be weighed in analyzing whether an individual is a "care custodian" for purposes of section 21350, even if none by itself is ultimately controlling in making that determination.

In this case, there is conflicting evidence regarding the nature of the payments Gungl received in connection with his care for Davidson. On the one hand, there is indisputable evidence that Gungl believed he was entitled to remuneration for his services, and was in fact paid. In 1998, after the San Mateo County Public Guardian was appointed to protect Davidson's interests, the representative of the San Mateo County Public Guardian's Adult Protective Service Agency instructed Gungl to submit a bill for the 24-hour care he and Holtz provided to Davidson between April and August 1998. Gungl and Holtz thereafter submitted a bill for their services to Davidson, which they calculated to be worth approximately $57,000.[11] Later, after Davidson was placed under the care of a conservator, Gungl was ordered to make an accounting of funds he had expended on Davidson's behalf. On October 6, 1999, following the evidentiary proceedings on that accounting, the superior court accepted Gungl's accounting, but ordered that he be surcharged a total of $7,782.70 for undocumented and other miscellaneous expenses in excess of $300 per month, as evidenced by checks written on Davidson's account over a period of the 64 months between March 1993 and July 1998. The court also denied Gungl's request for payment for services.[12] Attached to the surcharge order were three schedules listing disbursements to Gungl, Holtz and "cash," prepared from Gungl's accounting, copies of cancelled checks, and bank statements. According to this schedule, 24 of the checks written to Gungl were marked as going in whole or in part to "salary" or

---

[11] Starting on April 1, 1998, Gungl and Holtz undertook to provide Davidson with 24-hour care. The record shows that they did this on the advice of Chris Rodriguez, the representative of the San Mateo County Adult Protective Service Agency, and the same individual who subsequently instructed Gungl and Holtz to submit a bill for their services in this regard. It is undisputed that Gungl and Holtz were never paid for most of the 24-hour care that they provided for Davidson between April and August 1998, after which she was taken from her home and placed in an elder care facility.

[12] Significantly, we note that in imposing this surcharge, the court specifically stated: "While Mr. Gungl's actions were sloppy, disorganized, and often unwise in light of his duties to Dolores Davidson, the Court does not find, even by a preponderance of the evidence, that Stephen Gungl acted in bad faith."

"wages." It is primarily on the basis of these checks that appellant argues Gungl was a self-employed caregiver who only did what he did for the money.

In opposition to the inference appellant seeks to draw from this evidence of payments to Gungl for his services, however, is the substantial evidence that these payments were intended to and in fact did reimburse him solely for his out-of-pocket expenditures on Davidson's behalf. It is undisputed that Davidson had a limited income of approximately $600 per month. There was ample evidence that Gungl and Holtz frequently used their own resources to purchase clothes and other items for Davidson. Both Holtz and Gungl testified that Davidson's payments to them started when she insisted on paying them for the help they routinely gave her around her house and yard. They decided to use the money they received from her not only to repay themselves for their purchases of groceries and other everyday necessities for her, but also to make additional purchases for her of special gifts, such as dinners, lunches, shows, flowers, plants for her yard, clothing, and Christmas decorations. Under extensive cross-examination on the nature of the $200 to $300 per month "compensation" checks they received from Davidson, both Gungl and Holtz consistently and firmly insisted that all of these payments, no matter how denominated, were either immediately spent on Davidson, or else were used to reimburse themselves for previous expenditures made on her behalf.[13]

■ Taking into account both the evidence of these payments to Gungl by Davidson and the longevity and closeness of their 40-year personal relationship, and interpreting the entire record in a light most favorable to the judgment, as we must, we conclude there was ample substantial evidence to support the determination of the trial court that Gungl was not a "care custodian" for purposes of section 21350. The kind of assistance and care provided to Davidson by Gungl did not constitute professional health or social services; instead it arose out of Gungl's long-standing and affectionate personal relationship with Davidson. There was no evidence Gungl had ever provided care to any other person than Davidson, his friend of nearly 40 years. Gungl, a professional musician, was not a provider of health care or social services; he was simply an individual helping out a very old and dear friend in her time of need. The trial court found credible the evidence and testimony showing that the payments to Gungl were all utilized to provide benefits directly to Davidson, with no net profit to Gungl above what was

---

[13] Under cross-examination about a letter he wrote to Deauville chiding her for expecting any payment from Davidson and stating that he gave himself only "$200 per month" from Davidson's account, Gungl testified repeatedly that this money "didn't go in my pocket," but instead "I used it for Dolores." Indeed, Gungl insisted that "I didn't get a penny from that." Similarly, under lengthy cross-examination about the $200 or $300 "compensation" checks he received from Davidson, Holtz testified that he would immediately "spend it back on her."

necessary to reimburse his out-of-pocket expenses on her behalf.[14] Thus, the conclusion of the trial court that Gungl was not a "care custodian" for purposes of the bar of section 21350 is supported by the language of the statute, the legislative history thereof, and the substantial evidence contained in the record.

### SUBSTANTIAL EVIDENCE SUPPORTS FINDING OF NO UNDUE INFLUENCE

■ Even if, arguendo, we were to conclude that the trial court erred in determining that Gungl was not a "care custodian" for purposes of the statutory bar under section 21350—a conclusion we do *not* draw—we could not reverse the trial court's judgment unless we were also able to conclude, in light of the entire record, that the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) In this regard, we observe that as a general principle, where the decision of a lower court is correct on any theory of law applicable to the case, the judgment or order must be affirmed regardless of the correctness of the grounds upon which the lower court reached its conclusion. (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117]; *Estate of Beard* (1999) 71 Cal.App.4th 753, 776–777 [84 Cal.Rptr.2d 276]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal §§ 340–342, 406, pp. 382–385, 457–458.) For this reason, a trial court decision will be upheld even where it is based on an incorrect rule of law, as long as a sound legal basis for the decision exists. "In short, we will affirm a judgment or order if it is correct on any theory of law applicable to the case, even if it is right for the wrong reasons." (*Estate of Beard, supra,* 71 Cal.App.4th at p. 777.)

In this case, we conclude the judgment of the trial court was correct even if it erred in determining that Gungl was not a "care custodian" for purposes of section 21350. Under section 21351, the companion provision to section 21350, a number of exceptions are set out to the rules barring specific donative transfers. Of relevance to this case is section 21351, subdivision (d), which provides that "Section 21350 does not apply if any of the following conditions are met: . . . [¶] . . . [¶] (d) The court determines, upon clear and convincing evidence, but not based solely upon the testimony of any person

---

[14] The pertinent findings of the trial court were as follows: "3. [Gungl] was not an employee as defined in the care custodian definition which is included in the Welfare and Institutions Code [section] 15610.17. . . . [¶] . . . [¶] 5. Clearly, [Gungl] was not hired to provide health care services or societal services to [Davidson] and the provision of such services was not [Gungl's] occupation. [¶] . . . [¶] 7. A relationship did exist where [Gungl] had certain responsibilities vis-a-vis [Davidson] and money was paid to him to cover out of pocket expenses for her care. [¶] 8. [Gungl's] testimony was credible and all moneys received by [Gungl] and [Holtz] were for the direct benefit of [Davidson]. The surcharge of [Gungl] found by this Court [in the earlier conservatorship proceeding and accounting] was due to careless mismanagement as opposed to intentional scheming."

described in subdivision (a) of Section 21350, that the transfer was not the product of fraud, menace, duress, or undue influence." Thus, the judgment must still be affirmed despite any error in concluding that Gungl was not a care custodian if the trial court determined by clear and convincing evidence, and not based *solely* upon the testimony of Gungl himself or any individual involved in drafting the trust, that there was no undue influence, fraud or duress involved in the creation and execution of the living trust.

The record shows that the trial court made the requisite determination in this case, and that its determination was supported by substantial evidence. The statement of decision includes the following key findings: "1. The Court finds that [Davidson] when executing her Living Trust of January 19, 1996, was not subject to undue influence or mistake and that the trust document which she executed on January 19, 1996, is valid. The [Davidson living trust] of January 19, 1996, is to be given its full weight with all due consideration. [¶] . . . [¶] 11. The Court is *convinced* that [Gungl] did not exert undue influence in that [Gungl] did not actively participate in the procurement of the [Davidson living trust] of January 19, 1996, and did not unduly profit from said [trust]. [¶] . . . [¶] 16. The Court finds that [Davidson] exercised her own free will in executing the [living trust] and is *convinced* that there was no pressure or undue influence exercised by [Gungl]. Opportunity existed and a reasonable person could find a motive in the financial circumstances of [Gungl]. However, the long standing friendship between [Davidson] and [Gungl] and the emotional strength, the free will and feistiness of [Davidson], belie the existence of undue influence and the Court finds *convincingly* that none was exercised." (Italics added.) Finally and additionally, the trial court's concluding order includes the following: "5. The Court is *convinced* there was no undue influence exerted by respondent [Gungl] on trustor [Davidson] in the preparation and execution of the [Davidson living trust] of January 19, 1996." (Italics added.)

These findings were supported by ample evidence in the record, without any need to rely on the testimony of Gungl himself or anyone involved in the drafting and preparation of the trust instrument. The trial court could properly rely on the clinical evaluation of Dr. Bowen concluding that despite her mental decline, Davidson was completely clear in her independently-generated, autonomous determination to leave her estate to Gungl rather than the Morkens, based on her long-term relationship with the former and her suspicions about the desires and intentions of the latter. Confirming Dr. Bowen's analysis, Dr. Firestone in turn testified—on the basis of his independent evaluation of Davidson's medical records, consultations with her primary care physician and Dr. Bowen, and extensive interviews with her friends, neighbors and family—that Davidson had the necessary mental capacity to form a valid testamentary intent at the time of the execution of the trust in January 1996; her decision to leave the bulk of her estate to Gungl

was in fact freely and independently generated; and she did not execute the subject instruments on the basis of any undue influence.

Although the trial court could have relied upon the expert testimony alone in concluding that Davidson's execution of the subject trust was not procured through the undue influence of Gungl, there was ample additional evidence to support its conclusion. Extensive testimony was introduced at trial from longtime friends and neighbors of Davidson regarding the close personal relationship of Davidson and Gungl over 40 years, her obvious affection for both Gungl and Holtz as her "boys," and the love and genuine concern consistently manifested by Gungl toward Davidson. This evidence supported the conclusion that Davidson's decision to leave the bulk of her estate to Gungl rather than the Morkens was based on a long-standing affectionate relationship between the two, and not undue influence.

In addition, the trial court had the testimony of Deauville, who was present at both meetings between Davidson and AMA personnel. She testified that when questioned by Reilly, Davidson clearly stated without any prompting, pressure or coercion that she wanted Gungl to have everything. When Gungl inquired whether Davidson wanted to leave anything to her relatives the Morkens, Davidson said she thought $5,000 was "too much" for them. Nevertheless, Davidson did leave the Morkens that sum. At the second meeting, Day discussed the trust and will instruments with Davidson, who asked pertinent questions and insisted on reading every page carefully. Deauville testified that Davidson stated she would not sign anything without reading it first. Deauville also confirmed the testimony of both Reilly and Day that, although Gungl was present, he had virtually no participation in what occurred at either of these two meetings between Davidson and the AMA personnel. In addition, Deauville testified that Davidson expressed fear that the Morkens wanted to move into her home and place her in the "booby hatch."

Late in the trial, respondent asked the trial court to find on the basis of clear and convincing evidence that Davidson's execution of the trust was not the product of undue influence. On the basis of the substantial evidence adduced, the trial court so ruled at the conclusion of trial. ■ We are not in a position to reweigh any conflicts or disputes in this evidence. The trial court was the trier of fact and the sole judge of the credibility of witnesses; we are not. Even if different inferences can reasonably be drawn from the evidence, we may not substitute our own inferences or deductions for those of the trial court. Considering all of the evidence in the light most favorable to respondent as the prevailing party, as we must, and resolving conflicts in support of the trial court's decision, we conclude that there was substantial evidence in the record to support the trial court's finding, on the

basis of the clear and convincing standard, that Davidson's trust was not the product of Gungl's undue influence. (*Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 60 [148 Cal.Rptr. 596, 583 P.2d 121]; *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630–631 [85 Cal.Rptr.2d 386]; *Estate of Beard, supra,* 71 Cal.App.4th at pp. 778–779; 9 Witkin, Cal. Procedure, *supra,* §§ 359–364, pp. 408–415.)

## No Presumption of Undue Influence Shown

Citing the trial court's finding that "a confidential relationship existed" between Gungl and Davidson, appellant argues that Gungl bore the burden of overcoming a presumption of undue influence in Davidson's execution of the trust and pour-over will. Appellant is wrong.

■ Undue influence must be proven by clear and convincing evidence that a testamentary or other donative disposition was made as a result of undue pressure, argument, entreaty or other coercive acts inconsistent with any conclusion that the disposition was the voluntary and freely spontaneous act of the testator or settlor. "Undue influence, then, is the legal condemnation of a situation in which extraordinary and abnormal pressure subverts independent free will and diverts it from its natural course in accordance with the dictates of another person." (*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 605 [270 Cal.Rptr. 560]; *Estate of Truckenmiller* (1979) 97 Cal.App.3d 326, 334 [158 Cal.Rptr. 699].)[15]

■ Normally, the party contesting a testamentary disposition bears the burden of proving undue influence. (§ 8252, subd. (a).)[16] However, under certain narrow circumstances, a presumption of undue influence may arise, shifting to the proponent of the disposition the burden of proving by a preponderance of the evidence that the donative instrument was *not* procured by undue influence. This will occur only if *all* of the following elements are shown: (1) the existence of a confidential relationship between the party

---

[15] " 'Undue influence is established when it is shown that the testamentary disposition was brought about by undue pressure, argument, entreaty or other coercive acts that destroyed the testator's freedom of choice so that it fairly can be said that he was not a free agent when he made his will [citation]; undue influence can be established by circumstantial evidence so long as the evidence raises more than a mere suspicion that undue influence was used; the circumstances proven must be inconsistent with the claim that the will was the spontaneous act of the testator.' [Citation.] Clear and convincing proof is required. [Citation.] Undue influence will not be inferred from 'slight evidence.' [Citations.]" (*Estate of Truckenmiller, supra,* 97 Cal.App.3d at p. 334.)

[16] Section 8252, subdivision (a) provides in pertinent part: "At the trial, the proponents of the will have the burden of proof of due execution. The contestants of the will have the burden of proof of lack of testamentary intent or capacity, undue influence, fraud, duress, mistake, or revocation."

making the donative transfer and the person alleged to have exerted undue influence; (2) active participation by the latter in the actual preparation or execution of the donative instrument; and (3) the receipt by that person of undue profit from the executed instrument. It is for the trier of fact to determine whether the presumption will apply, and whether the burden of rebutting it has been satisfied. (*Estate of Sarabia, supra,* 221 Cal.App.3d at p. 605.)

In this case, near the end of his case-in-chief, appellant moved the court to rule that he had established these elements of the presumption, thereby shifting to respondent the burden of proving that no undue influence had been exerted on Davidson to execute the trust. The trial court denied the motion, effectively ruling that the presumption did not apply. Subsequently, the trial court found that although a confidential relationship did exist between Davidson and respondent Gungl, he had no active participation in procuring the trust and had not unduly profited from it.

There was no error; the trial court's findings were supported by substantial evidence. The record shows that Gungl's participation in the creation of the trust was extremely limited. After using the AMA to prepare his own living trust and that of his mother, Gungl suggested to Davidson that she consider having the AMA prepare a living trust for herself. Gungl contacted the AMA on Davidson's behalf, and was present on the two occasions AMA representatives met with Davidson. The testimony of Reilly and Deauville shows that beyond his presence, Gungl had virtually no participation in the initial meeting, and none in the actual preparation or execution of the trust. Davidson herself engaged in coherent discussions with Reilly about her desires and the beneficiaries she wished to name. Reilly testified that Gungl absented himself when trust specifics were discussed, and Davidson independently told her that she wanted Gungl to have everything. Like Reilly, Day spoke with Davidson directly. Day went over every page of the trust and pour-over will with Davidson, who asked intelligent questions and insisted on reading each page. Day testified that based on his long experience of working with persons executing living wills, he formed the opinion that Davidson was not acting under undue influence. Once again, the record shows that although Gungl was present, his participation in this second meeting was minimal.

The record similarly supports the trial court's finding that Gungl did not unduly profit from Davidson's execution of the trust. The issue is not whether Gungl profited from Davidson's disposition of her estate; it is whether his profit was "undue." The determination of this issue is based on a qualitative assessment of the evidence, not a quantitative one. "To determine if the beneficiary's profit is 'undue' the trier must necessarily decide what profit would be 'due.' These determinations cannot be made in an evidentiary

vacuum. The trier of fact derives from the evidence introduced an appreciation of the respective relative standings of the beneficiary and the contestant to the decedent in order that the trier of fact can determine which party would be the more obvious object of the decedent's testamentary disposition." (*Estate of Sarabia, supra,* 221 Cal.App.3d at p. 607.)

■ Here, the record shows that Davidson and Gungl had been close friends for approximately 40 years, beginning in 1962. They spent large amounts of time together. As the years passed, and after the death of Davidson's husband, Gungl visited Davidson with greater frequency. He came to her house at least twice a week and often four times or more to visit and make sure Davidson was doing all right. As she aged and her health declined, the relationship progressed toward one of increasing caregiving, with Gungl buying Davidson's groceries, cooking her meals, and driving her to the doctor or other places she had to go. In contrast, appellant Morken rarely saw Davidson until 1988, when he moved to California with his wife, Davidson's cousin. His only interest in Davidson's estate was through marriage. There is no evidence appellant took any interest in, or was even aware of, Davidson's declining physical and mental condition until after he learned that Davidson had executed the trust, under which he would lose his expected inheritance of her property. On this record, we conclude the trial court did not err in determining that, based on the nature of Gungl's relationship with Davidson, his "profit" from the disposition made by her trust was not "undue."[17] Thus, the trial court's determination that there was no presumption of undue influence was supported by substantial evidence.

We note that this result remains the same regardless of whether there was a presumption of undue influence in this case. In the first place, for us to find the presumption applicable on these facts, there would have to have been insufficient evidence in the record to support the trial court's conclusions that Gungl had no active participation in the actual preparation and execution of the trust, and that he secured no undue profit thereunder. This was not the case. Moreover, even if we were to conclude the presumption of undue

---

[17] The trial court's finding, as set forth in its statement of decision, is striking. The trial court stated: "8. [Respondent Gungl's] testimony was credible . . . . [¶] 9. The Petitioner, [appellant Morken], was genuinely concerned about his relative, [Davidson], due to her advanced years and her diminishing mental capacity and showed a genuine amount of care for her. [¶] 10. The record is absolutely totally convincing that petitioner [Morken] did not care for [Davidson] one tiny fraction as much as [Gungl] and Howard Holtz. The Court finds that [Gungl's] sincere concern for [Davidson] is manifested throughout the evidence that the Court considered. This care by [Gungl] has been going on for a very long time. [¶] . . . [¶] 13. The fact that [Gungl] was not a blood relative is not proof of undue profit by [Gungl]. The Court concludes from the evidence that [Gungl] is the more obvious object of [Davidson's] testamentary disposition. Anyone who spent more than a very limited time with [Davidson] would conclude unequivocally that [Gungl] was a more obvious object of [Davidson's] testamentary disposition than Petitioner [Morken]."

influence was activated under these facts and the burden of proof did shift, respondent would then only have been required to prove the absence of undue influence by a preponderance of the evidence. As seen, the trial court determined *by clear and convincing evidence* that Davidson executed the trust freely, voluntarily, and without any undue influence, a determination amply supported by substantial evidence in the record. In either case, then, our conclusion is the same: there was substantial evidence in the record to support the trial court's determination that the trust was not the product of undue influence, and the judgment must be affirmed.

## Disposition

The judgment is affirmed. Appellant shall pay respondent's costs on appeal.

Parrilli, J., and Pollak, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 24, 2004.