[No. E036685. Fourth Dist., Div. Two. Nov. 28, 2006.]

Estate of HELEN L. ODIAN, Deceased.
CATHARINA VULOVIC, Petitioner and Appellant, v.
RICHARD L. ROBINSON et al., Contestants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II. of the Discussion.

COUNSEL

Jones & Lester, Mark A. Lester and Scott M. Olken for Petitioner and Appellant.

Bill Lockyer, Attorney General, Belinda Johns, Assistant Attorney General, James M. Cordi and Tania M. Ibanez, Deputy Attorneys General; Rodriguez, Horii & Choi, Reynolds T. Cafferata; Swan, Carpenter, Wallis & McKenzie, Kevin A. McKenzie; Benedon & Serlin, Gerald M. Serlin and Douglas G. Benedon for Contestants and Respondents.

OPINION

**McKINSTER, Acting P. J.**—Eighty-seven-year-old Helen L. Odian died in January 2003, leaving her entire estate to appellant Catharina Vulovic, who

had been her paid live-in companion for approximately two years before Ms. Odian moved into a nursing home. The trial court found that Ms. Vulovic (hereafter sometimes appellant) exercised undue influence to make herself the sole beneficiary of Ms. Odian's trusts, wills and annuities, and that Ms. Odian lacked legal capacity when she executed the trusts and the annuity contracts. The court also found that appellant was a care custodian within the meaning of Probate Code section 21350, and as such, was disqualified as a beneficiary of Ms. Odian's testamentary instruments.

In the published portion of this opinion, we address appellant's contention that she was not a care custodian within the meaning of Probate Code section 21350. We conclude that the undisputed evidence demonstrates that appellant was a care custodian. Because she failed to rebut the presumption of undue influence which arises from that fact, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Helen Odian and her older sister, Ruth, lived together their entire adult lives. Neither married, and neither had children. Although the sisters had modest incomes, they invested wisely. With the help of their financial advisor, Richard Robinson, who advised them from 1976 until 2002, they amassed significant wealth. At the time of her death, Helen's estate was worth approximately $3 million.[1]

In 1997, the sisters executed wills leaving their estates to each other and then to the seven charities which are parties to this action. In 1997, Ruth Odian died. Helen Odian continued to rely on Richard Robinson for financial advice and tax preparation. He had a power of attorney for her bank account and wrote checks for certain items, such as estate tax and income tax payments. Robinson and his wife, Jessie, also had a social relationship with the Odian sisters. After Ruth's death, their contact with Helen increased. Ruth had been the dominant sister and had made most of the decisions. After her death, the Robinsons felt that they had to take care of Helen "to some degree" and to reassure her that they would assist her if any problems arose.

Helen had designated Ruth the beneficiary of her IRA's (individual retirement accounts). After Ruth's death, Mr. Robinson advised Helen to designate another beneficiary in order to avoid taking increased distributions from the IRA's. Helen designated Mrs. Robinson. Mrs. Robinson agreed that she would donate the IRA's to charity after Helen's death.

---

[1] We refer to the Odian sisters by their first names in this part of the opinion merely for simplicity. No disrespect is intended. Elsewhere, we refer to Helen Odian as Ms. Odian.

In the spring of 2000, Jessie Robinson suggested to Helen that she get someone to help her. Her home was cluttered and needed cleaning. In February 2000, Helen had hurt her back, and she had also lost her driver's license. A mutual acquaintance told Catharina Vulovic that Helen needed help with household tasks and transportation and encouraged her to contact Helen. Ms. Vulovic called Helen and then met with her to discuss arrangements.

Helen hired Ms. Vulovic to do housework and laundry, cook, and drive her to appointments and on shopping trips. Helen asked her to work from noon to 6:00 p.m. seven days a week, for $9 an hour. Ms. Vulovic began working for Helen on March 1. The initial plan was for Ms. Vulovic to work only for one month. However, toward the end of March, Helen asked Ms. Vulovic to move in with her. Jessie Robinson liked Ms. Vulovic and encouraged the arrangement. Ms. Vulovic agreed to do so and to stay on for an additional four months. Her rate of pay remained the same, as did the services she was to provide and the number of hours she was paid to work each day. At the end of the four-month period, Helen asked Ms. Vulovic to stay permanently. After discussing it with her family, Ms. Vulovic agreed. Thereafter, Helen paid her $500 a week.

Helen was very appreciative of Ms. Vulovic's assistance. She told friends and acquaintances that Ms. Vulovic "did everything" for her and she appeared to look to Ms. Vulovic "more or less for help and guidance." She told her friend David Gibson that she would not have lived as long if she had not had Ms. Vulovic's assistance and that she wanted to leave her estate to Ms. Vulovic.[2] Helen became acquainted with Ms. Vulovic's family and was invited to family gatherings, including the wedding of Ms. Vulovic's son. Ms. Vulovic celebrated some holidays with Helen and David Gibson. Ms. Vulovic's children and grandchildren visited Helen at home frequently, and Helen enjoyed their visits. When Helen was hospitalized, Ms. Vulovic visited her every day. After Helen was moved to a residential care facility, Ms. Vulovic and her family visited her. However, Helen never gave Ms. Vulovic a birthday or Christmas gift.

Beginning in 2001, Ms. Vulovic began helping Helen pay her bills. At first, Ms. Vulovic merely wrote the checks at Helen's direction and Helen signed them. Eventually, Helen gave her a power of attorney and Ms. Vulovic began writing checks on Helen's account and signing them. In the middle of 2001, Helen accepted $250,000 as payment in full of two promissory notes from Kirk Brown. However, Helen and Ruth had lent Brown $500,000, and the

---

[2] David Gibson died before the trial. The trial court reviewed his deposition transcript in lieu of testimony. Appellant's motion to augment the record with the transcript of David Gibson's deposition is granted.

notes were for $250,000 each. When Richard Robinson learned that Brown had paid Helen $250,000 for both notes, he reminded her that the loan was for $500,000. Helen became very upset and said that she would not have accepted the money if she had known that. Mr. Robinson prevailed upon Brown to return the notes, and returned the $250,000 to him. Helen remained upset about the incident for several weeks, and had to be reminded several times that it had been resolved.

Both Robinsons had noticed that Helen's memory was failing. Richard Robinson had noticed that Helen could carry on a normal conversation but that within a few minutes, she would not remember what they had talked about. Jessie Robinson also began to notice that Helen was having difficulty expressing herself. If she was asked a "yes or no" question, she could respond, but if she was asked a more complex question, she had greater difficulty responding.

In the summer of 2001, Mr. Robinson suggested to Helen that she create a living trust to avoid probate of her estate. She agreed, and told him that she wanted the trust proceeds to go to the seven charities that were the beneficiaries of her 1997 will. Mr. Robinson was concerned about Helen's capacity to make a trust, but he concluded that he could proceed because Helen was not changing beneficiaries but merely avoiding probate. Late in 2001, Helen told him that she wanted to leave her mobilehome to Ms. Vulovic. Mr. Robinson did not question that, because the mobilehome was a small part of Helen's estate.

Mr. Robinson arranged to have the trust and pour-over will prepared by the attorney who prepared Helen's earlier will. He made an appointment with Helen for March 2, 2002, for her to sign the trust documents and the will and to discuss her taxes. However, on March 1, Mr. Robinson received a faxed letter from Helen cancelling the appointment and stating that Helen intended to write her own will. Ms. Vulovic wrote the letter and Helen signed it. The Robinsons' subsequent efforts to contact Helen failed. She did not respond to any of their letters or return any of their telephone calls. Helen directed her mutual fund company to cease sending statements to Mr. Robinson, as they had for 26 years.

On February 28, 2002, Helen executed a will, trust, power of attorney and durable power of attorney and living will using fill-in-the-blank forms. Ms. Vulovic filled in all of the information and Helen signed the documents. The will and trust left Helen's entire estate to Ms. Vulovic. The will was witnessed by Helen's friend David Gibson and by her neighbor, Carolyn McMullen. However, when Helen took the documents to Mail Depot Plus to

be notarized, the witnesses' signatures could not be notarized because they were not present. Two customers at the store rewitnessed the will and their signatures were notarized. The witnesses and the notary all testified that Helen appeared to be in control of the situation and did not appear to be acting under the influence or at the direction of Ms. Vulovic.

In March 2002, a representative of Family First Advanced Estate Planning Services (Family First), called Helen's home, asking for Ruth. Ms. Vulovic took the call, and made an appointment to have a representative visit Helen to discuss estate planning. Sean Perry, a commissioned salesman with little training in estate planning, visited Helen shortly thereafter. Helen told him that she did not understand or thought there might be some problem with the will and trust she had executed on February 28. She told him that she needed help getting money back from Kirk Brown, even though Mr. Robinson had resolved that matter months earlier. Helen purchased a group legal services plan and submitted an estate planning application to Family First, along with the February 28 will and trust, to be reviewed by an attorney.

Despite concerns about Helen's competence, a group legal services attorney prepared a new pour-over will and a restated trust for Helen. A representative of Family First delivered the documents to Helen on April 18, 2002. After he reviewed the will with her, Helen executed the will. On May 2, the Family First representative visited Helen and went over the restated trust, which she then executed, along with documents transferring assets to the trust.

During the April 18 meeting, the Family First representative discussed with Helen the safety of her mutual fund IRA investment in American Funds. Helen told him she was concerned about the market and potential loss of value of the funds and that she needed additional income. He suggested that she transfer the IRA to fixed annuities. Helen agreed, and he helped her prepare an application for the annuities. Ultimately, Helen transferred her American Funds mutual fund IRA, amounting to nearly $1 million, to two annuities. Helen made Ms. Vulovic the successor beneficiary of the annuities, followed by Ms. Vulovic's three children.

In late April 2002, Richard Robinson reported his concerns about Helen to Adult Protective Services. He spoke to investigator Larry Smith. Smith's job was to do initial assessments to determine whether a person has the mental capability to make his or her own decisions. He had done approximately 1,350 such assessments, approximately half of which resulted in the conclusion that the person did not need further evaluation.

Smith visited Helen on the morning of May 2. He spent 30 to 60 minutes with her. He initially was unable to converse with Helen. It appeared that she had no difficulty hearing him, but when she tried to respond to his questions, she appeared to be unable to do so. She was able to ask him to sit down and to say "OK, I guess" when he asked how she was. After a few minutes, Ms. Vulovic joined them. Thereafter, she responded to all of the questions Smith directed to Helen. She told him, "You'll have to excuse Helen. She has a hard time completing sentences and explaining what she wants." Smith concluded that a professional evaluation was necessary in order to determine Helen's mental capacity. He set up an appointment with Helen's physician for an evaluation. However, Helen did not keep the appointment. Smith contacted the county public guardian and requested a professional evaluation.

Dr. Robert Sawicky, a psychologist with approximately 20 years of experience in performing forensic evaluations to assess mental capacity, was asked by the office of the Riverside County Public Guardian to conduct a conservatorship evaluation on Helen, including issues of undue influence and legal and testamentary capacity. He was qualified to assess dementia. On May 16, 2002, he visited Helen in her home. The visit was unannounced. Dr. Sawicky spent about two and a half hours observing Helen, conversing with her and conducting the formal assessment. He observed that she appeared to be very dependent. Ms. Vulovic was with her the entire time she was getting dressed and groomed, and although he did not directly observe their activities, he had the sense that Helen needed assistance with her grooming and hygiene activities. When she came into the kitchen, she said she was hungry. Pat Puliafico, a public guardian probate investigator who was present, prepared a Pop Tart and fed it to Helen. Helen passively accepted being fed, as though it was a commonplace occurrence.

Helen was initially uncomfortable and guarded in speaking to Dr. Sawicky, but after some conversation and explanation as to the purpose of the visit, she warmed up and became comfortable enough for him to conduct the evaluation. He observed that her speech was a bit disjointed, that she was not capable of "real goal-directed discourse." She would sometimes "derail" herself midsentence, and would sometimes "shift gears and make what seems like a bit of a tangential statement in the context of what she was saying." She sometimes appeared to refrain from answering a question if she found it too difficult to answer. She did not give direct responses to Dr. Sawicky's questions about where she grew up, where she went to school and about her family. She later volunteered that she had a sister, Ruth, who had died recently. She could not remember, or could not produce, Ms. Vulovic's name until Dr. Sawicky prompted her. She volunteered the information that

she had had a stroke. She did not appear to have any difficulty hearing him. Helen was aware of her difficulties in completing sentences and retrieving words and was frustrated by it. However, she could still make herself understood.

Helen told Dr. Sawicky that Ms. Vulovic "does everything for me." She said that Ms. Vulovic had wanted to take charge of bill paying and money management, and that she had let her do so. She said that the Robinsons used to be in charge, but that they stopped coming around and didn't give her any records. When Dr. Sawicky first mentioned the Robinsons, Helen's spontaneous reaction was to "gush," i.e., display a spontaneous positive emotional response. She said that Mr. Robinson had made her a lot of money. However, she said that after Ms. Vulovic came to her, she came to believe that Mr. Robinson had overcharged her.

Helen was aware that she had a checking account and a savings account, but could not tell Dr. Sawicky the name of her bank. She did not know the amount of money in either account. She did not know of any other investments or the amount of money involved in any investments. She was unable to perform arithmetic. When asked if she had a will or a trust, she replied that she had a trust. She said that the proceeds of the trust were to go to charity. She said that the trust "was made in accordance with my wishes." Dr. Sawicky was startled to hear her use such a formal phrasing and found it hard to imagine that Helen had come up with that statement independently.

Dr. Sawicky concluded that Helen suffered from mild to moderate expressive aphasia—a difficulty in retrieving words—as well as difficulty in organizing information. She also had attention and concentration problems, and both long-term and short-term memory problems. He concluded that she suffered from moderate dementia. He also concluded that she was very dependent and that as a result of that, along with her cognitive impairments, she was vulnerable to undue influence. Finally, he concluded that she lacked testamentary and legal capacity and needed a probate conservatorship of her person and of her estate. Based on his contact with her in May 2002, he did not believe that she had legal or testamentary capacity when she executed the wills, trusts and annuity contracts.

Dr. Sawicky acknowledged that Helen's friends and acquaintances did not believe that she was cognitively impaired, and that people who had witnessed her wills or notarized her signatures had testified that Helen did not appear to be impaired. However, he doubted that such people had asked her pointed questions to elicit her level of functioning, and that people would normally be

tolerant of deficiencies in word retrieval and other communication difficulties in an 86-year-old woman. He pointed out that Helen was capable of casual conversation and had even made a joke, which both he and she found funny, during his conversation with her. Thus, her communication abilities might appear normal in casual conversation.

Dr. James Spar, a geriatric psychiatrist, reviewed Helen's medical records, Dr. Sawicky's reports and other documents, but did not interview Helen. He generally agreed with Dr. Sawicky's conclusions, assuming that his observations were correct. He disagreed that Helen was totally dependent, but concluded from all the material that he read that she was moderately dependent. He concluded that Helen was "extremely vulnerable" to undue influence and that her impairment began "way before" February 2002. He did not disagree with Dr. Sawicky's conclusions that Helen lacked testamentary and legal capacity at least as early as February 2002. He disagreed with the testimony of Ms. Vulovic's expert, Dr. Victoroff, that Dr. Sawicky's methodology in conducting his evaluation of Helen was seriously flawed. He concluded that Dr. Victoroff assumed that Helen's aphasia was more severe than it actually was. He also concurred that Helen's ability to appear normal in casual conversations or brief interactions would be expected at her level of cognitive impairment.

On May 29, 2002, Helen's regular doctor, Dr. Raja, administered a mental examination, which showed that Helen had moderate cognitive impairment. Dr. Raja was surprised, based on his interactions with Helen. CAT (Computed Axial Tomography) scans Dr. Raja had ordered previously showed that Helen probably had a stroke in 2000 but had not had any additional strokes since then.

The Riverside County Public Guardian was appointed Helen's conservator in June 2002. In August 2002, Helen was hospitalized, and then moved to a residential care facility. She died on January 3, 2003.

Ms. Vulovic filed a petition to probate Helen's will dated February 28, 2002, as well as her pour-over will, dated April 18, 2002. Richard Robinson filed a petition to probate Helen's 1997 will and contested the 2002 wills and sought to invalidate the 2002 trusts and the annuities. The seven charities that were beneficiaries of Helen's 1997 will joined. Ms. Vulovic and her sons contested the petitions. Robinson, the charities and the Attorney General answered the contest.

The court found that the February 28, 2002 form will, the February 28, 2002 trust, the April 18, 2002 pour-over will, the May 2, 2002 restated trust

and the two annuities were invalid as the products of undue influence on Helen Odian by Catharina Vulovic; that the February 28, 2002 trust, the May 2, 2002 restated trust and the two annuities were invalid because Helen Odian lacked legal capacity to execute them; and that Catharina Vulovic and her family were disqualified as beneficiaries by operation of Probate Code section 21350 et seq. The court denied Ms. Vulovic's petition for probate of the 2002 wills and granted the petitions to probate the 1997 will and to invalidate the 2002 trusts and annuities.

Ms. Vulovic filed a timely notice of appeal.

## DISCUSSION

### I.

### PROBATE CODE SECTION 21350, SUBDIVISION (a)(6) BARS ALL DONATIVE TRANSFERS TO APPELLANT AND HER SONS

#### A. Appellant Was a Care Custodian Within the Meaning of Probate Code Section 21350, Subdivision (a)(6)

■ Probate Code section 21350,[3] subdivision (a) provides that "no provision, or provisions, of any instrument[4] shall be valid to make any donative transfer to any of the following: [¶] . . . [¶] (6) A care custodian of a dependent adult who is the transferor." (§ 21350, subd. (a)(6).) Section 21350 does not apply if "[t]he court determines, upon clear and convincing evidence, but not based solely upon the testimony of any person described in subdivision (a) of Section 21350, that the transfer was not the product of fraud, menace, duress, or undue influence." (§ 21351, subd. (d).) Thus, if appellant was a care custodian, all donative transfers to her were presumptively barred by section 21350, subdivision (a)(6). (*Bernard v. Foley* (2006) 39 Cal.4th 794, 800 [47 Cal.Rptr.3d 248, 139 P.3d 1196].) Transfers to her sons as successor beneficiaries of the annuities would be barred as well. (§ 21353.)[5]

Because our analysis requires us to interpret the meaning of section 21350, we review the matter de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.*

---

[3] All further statutory references will be to the Probate Code unless otherwise indicated.

[4] "Instrument" is broadly defined in section 45 as "a will, trust, deed, or other writing that designates a beneficiary or makes a donative transfer of property."

[5] As pertinent, section 21353 provides: "If a transfer fails under this part, the transfer shall be made as if the disqualified person predeceased the transferor without spouse or issue . . . ."

(2000) 24 Cal.4th 415, 430 [101 Cal.Rptr.2d 200, 11 P.3d 956] [appellate courts independently determine the proper interpretation of a statute].)

■ "The term 'care custodian' has the meaning as set forth in Section 15610.17 of the Welfare and Institutions Code." (§ 21350, subd. (c).) As pertinent to this case, the Welfare and Institutions Code defines "care custodian" as "any . . . person providing health services or social services to elders or dependent adults." (Welf. & Inst. Code, § 15610.17, subd. (y).)

Appellant does not dispute that Ms. Odian was a dependent adult within the meaning of section 21350, subdivision (a).[6] However, appellant contends that she was not a care custodian as a matter of law for three reasons: because she had a personal relationship with Ms. Odian, because she was not a professional caregiver, and because she did not provide the kind of services which define a care custodian's role.

Appellant relied primarily on *Conservatorship of Davidson* (2003) 113 Cal.App.4th 1035 [6 Cal.Rptr.3d 702] (*Davidson*) to contend that her personal relationship with Ms. Odian excluded her from disqualification. In *Davidson*, the Court of Appeal held that in enacting section 21350, subdivision (a) (hereafter section 21350(a)), the Legislature did not intend to apply the presumption of undue influence to individuals who have assumed the role of care custodian to a dependent adult, if that role evolves naturally out of a personal relationship with the dependent adult which preexisted the caregiving role. However, if the personal relationship is "entirely incidental, secondary to, and derived from the preexisting professional or occupational connection" as caregiver, section 21350(a) presumptively bars any donative transfer. (*Davidson, supra*, 113 Cal.App.4th at p. 1052; accord, *Conservatorship of McDowell* (2004) 125 Cal.App.4th 659, 667–668, 673 [23 Cal.Rptr.3d 10].)

After the conclusion of briefing but before oral argument in this case, the California Supreme Court issued its opinion in *Bernard v. Foley, supra*, 39 Cal.4th 794 (*Bernard*). In *Bernard*, the court analyzed the purpose underlying

---

[6] Subdivision (c) of section 21350 provides that "the term 'dependent adult' has the meaning as set forth in Section 15610.23 of the Welfare and Institutions Code and also includes those persons who (1) are older than age 64 and (2) would be dependent adults, within the meaning of Section 15610.23, if they were between the ages of 18 and 64." The Welfare and Institutions Code defines "dependent adult" as "any person between the ages of 18 and 64 years who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have physical or developmental disabilities, or whose physical or mental abilities have diminished because of age." (Welf. & Inst. Code, § 15610.23, subd. (a).)

section 21350(a) and concluded that the Legislature did not intend to exclude caregivers who had preexisting personal relationships with the decedent from the classes of individuals to whom the presumption of undue influence applies. (*Bernard*, at pp. 801–816.) Accordingly, it disapproved *Davidson* as well as *Conservatorship of McDowell, supra*, 125 Cal.App.4th 659, and *Estate of Shinkle* (2002) 97 Cal.App.4th 990 [119 Cal.Rptr.2d 42], "to the extent they interpreted section 21350 as allowing for a preexisting personal friendship exception." (*Bernard*, at p. 816, fn. 14.) We note, however, that even under *Davidson*, the transfers to appellant were presumptively barred because it was undisputed that appellant's relationship with Ms. Odian resulted from her employment by Ms. Odian, and not the converse. (*Davidson, supra*, 113 Cal.App.4th at p. 1054.)

*Bernard* also addressed appellant's contention that section 21350(a)(6) was intended to apply only to professional caregivers, and concluded that "nothing in the statute's structure, terms or language authorizes us to impose a professional or occupational limitation on the definition of 'care custodian' " as defined in Welfare and Institutions Code section 15610.17. (*Bernard, supra*, 39 Cal.4th at pp. 806–809.) The court further concluded that the legislative history of section 21350 buttressed its conclusion. (*Bernard*, at pp. 809–813.) Thus, the fact that appellant had never previously worked as a caregiver and was arguably not a professional caregiver, even though she was being paid for her services to Ms. Odian, is immaterial to her claim that she was not a care custodian within the meaning of section 21350(a)(6).

Finally, we address appellant's contention that the services she provided to Ms. Odian were not of the type which define the function of a care custodian.

As noted above, section 21350(a)(6) adopts the definition of "care custodian" found in Welfare and Institutions Code section 15610.17. (§ 21350, subd. (c).) As pertinent here, subdivision (y) of Welfare and Institutions Code section 15610.17 defines "care custodian" as "[a]ny . . . person providing health services or social services to elders or dependent adults." Appellant contends that *Davidson, supra*, 113 Cal.App.4th 1035 holds that services such as cooking, cleaning, shopping and driving "do not amount to health or social services of a care custodian." Based on that understanding of *Davidson*, she contends that the services she provided do not amount to health or social services within the meaning of Welfare and Institutions Code section 15610.17, subdivision (y).[7]

---

[7] In *Bernard*, the court disapproved *Davidson* only to the extent that *Davidson* held that section 21350(a) allows for a "preexisting personal friendship exception." (*Bernard, supra*, 39 Cal.4th at p. 816, fn. 14.) Thus, *Davidson* remains citable authority with respect to its discussion of the social services issue.

Leaving aside, for the moment, the fact that the trial court found that appellant provided significantly greater services than cooking, cleaning and shopping, we note that the court in *Davidson* did not actually hold that services such as those are not social services within the meaning of the statute. In *Davidson*, the court found, primarily, that the beneficiary of the estate was not a care custodian because his role as the decedent's caregiver arose naturally from his long-term friendship with her and not from his employment as a caregiver. (*Davidson, supra,* 113 Cal.App.4th at pp. 1050–1054, discussed *ante.*) Secondarily, the court *questioned* whether services such as cooking, gardening, running errands, providing transportation, grocery shopping and providing assistance with banking could be equated with social services. It concluded that "[e]ven if the kind of unsophisticated care and attention" that the beneficiary provided "*could* be described as constituting health and social services" (*id.* at p. 1050, italics added), the beneficiary in that case was nevertheless not a care custodian because (1) the unpaid services he provided allowed the decedent to continue to live independently, in her own home (while the beneficiary maintained his own home), and (2) the beneficiary "had no professional expertise or occupational experience in providing such services." (*Ibid.*) For the latter reason alone, the court held, the beneficiary did not qualify as a care custodian under section 21350 and Welfare and Institutions Code section 15610.17.[8] (*Davidson, supra,* 113 Cal.App.4th at p. 1050.) In reaching this conclusion, the *Davidson* court did not seek to ascertain the meaning of the term "social services" as it is used in section 21350 and Welfare and Institutions Code section 15610.17, nor did it hold that services such as the ones provided by the beneficiary in that case did not amount to social services within the meaning of Welfare and Institutions Code section 15610.17. It is therefore not authority on the question before us. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1176 [119 Cal.Rptr.2d 903, 46 P.3d 372] [a case is not authority for a point which it does not address].)

Similarly, in *Bernard, supra,* 39 Cal.4th 794, the court discussed the nature of the services provided by the beneficiary and concluded that they amounted to "substantial, ongoing health services." (*Id.* at pp. 797, 805–806.) However, Welfare and Institutions Code section 15610.17, subdivision (y) provides that a care custodian includes any person who provides either health services *or* social services. In *Bernard*, the court did not discuss the meaning of the term "social services," and it did not hold, as appellant contends, that *only* the provision of substantial ongoing health services renders a caregiver a care

---

[8] As discussed above, *Bernard* held that the application of section 21350(a) is not limited to professional caregivers. (*Bernard, supra,* 39 Cal.4th at p. 809.) It thus implicitly overruled *Davidson* on this point as well.

custodian within the meaning of section 21350(a)(6). Accordingly, we must determine the meaning of "social services" in the context of section 21350(a)(6) as a question of first impression.

■ Neither section 21350 nor Welfare and Institutions Code section 15610.17 defines "social services." If statutory terms are unclear or ambiguous, we may consider various extrinsic aids to help us ascertain the Legislature's intent, including legislative history and "the ostensible objects to be achieved." (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) In such circumstances, "we ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citations.]" (*Ibid.*)

Even though this is a question of first impression, we do not write on a completely blank slate. In *Bernard*, the court analyzed the legislative history of section 21350(a). After first noting that section 21350 was originally enacted for the purpose of preventing " 'unscrupulous persons in fiduciary relationships from obtaining gifts from elderly persons through undue influence or other overbearing behavior[,]' " the court determined that the underlying problem the Legislature sought to remedy by amending section 21350(a) to add care custodians to the list of presumptively barred transferees was that " 'care custodians are often working alone and in a position to take advantage of the person they are caring for.' [Citation.]" (*Bernard, supra,* 39 Cal.4th at pp. 809–810.) Moreover, the court recognized that in enacting the Elder Abuse and Dependent Adult Civil Protection Act of 1994, of which Welfare and Institutions Code section 15610.17 is a part, the Legislature intended to create "an expansive class of individuals obligated to report elder abuse to the proper authorities." (*Bernard*, at p. 813.) In enacting Welfare and Institutions Code section 15610.17, the Legislature declared that its intent was "very broad, specifically, 'to provide that [proper authorities] shall receive referrals or complaints from public or private agencies, from any mandated reporter submitting reports pursuant to [Welfare and Institutions Code] Section 15630, *or from any other source having reasonable cause to know that the welfare of an elder or dependent adult is endangered . . . .*' [Citation.]" (*Bernard, supra,* at p. 813 [with the exception of the omitted citation, the bracketed material and italics appear as in *Bernard*].) Thus, the court recognized that the Legislature intended the definition of "care custodian" as used in Welfare and Institutions Code section 15610.17 to apply expansively to protect vulnerable elders. There is no reason to believe that it intended a narrower application of the identical term when it enacted section 21350(a)(6). On the contrary, an expansive interpretation of "social services" to include personal services

provided by an in-home caregiver best promotes the Legislature's objective of protecting vulnerable dependent adults from exploitation.

■ Here, the trial court found that appellant was employed "to provide in-home care." In that capacity, she "cooked, cleaned and drove [Ms. Odian] to appointments, meetings and shopping" *and* "took care of [Ms. Odian's] home, took care of [Ms. Odian] and was [Ms. Odian's] paid live-in caregiver." Appellant does not dispute those findings. A "paid live-in caregiver" clearly provides social services within the meaning of section 21350(a) and is, therefore, a care custodian. Thus, based on the trial court's undisputed findings, we conclude that appellant was a care custodian within the meaning of section 21350(a)(6).

### B. Appellant Failed to Prove That the Transfers Were Not the Result of Undue Influence

Section 21350 does not apply if "[t]he court determines, upon clear and convincing evidence, but not based solely upon the testimony of any person described in subdivision (a) of Section 21350, that the transfer was not the product of fraud, menace, duress, or undue influence." (§ 21351, subd. (d).) Thus, the burden is on the presumptively disqualified transferee to rebut the presumption. (*Bernard, supra*, 39 Cal.4th at p. 800.) The trier of fact determines whether the burden of rebutting a presumption has been satisfied. The appellate court reviews the finding that the burden has not been satisfied under the substantial evidence rule. (*Estate of Shinkle, supra*, 97 Cal.App.4th at p. 1008 [disapproved on other grounds in *Bernard, supra*, at p. 816, fn. 14].)

Appellant contends that there was not substantial evidence to support the trial court's finding because there was no competent evidence that Ms. Odian was cognitively impaired. She asserts that the testimony of respondents' two expert witnesses, Dr. Sawicky and Dr. Spar, should have been excluded, and that there was no other evidence of cognitive impairment. She asserts (based on the testimony of Dr. Spar, whose testimony she asserts should have been excluded) that "unless there is cognitive impairment and dependency, there can be no susceptibility to undue influence."

We reject appellant's contention that the court abused its discretion in admitting the expert testimony of Dr. Sawicky and Dr. Spar. She contends that she objected to the admissibility of their testimony, based on Dr. Sawicky's lack of expertise with regard to expressive aphasia. Dr. Spar's opinion was based solely on his review of Dr. Sawicky's report and was not competent evidence in its own right. We can dispose of this contention summarily.

Although trial counsel filed a motion in limine seeking to exclude the experts' testimony, he did not obtain a ruling. Indeed, when the court questioned whether a motion in limine was the proper vehicle to challenge anticipated evidence in a bench trial, counsel withdrew the motion, saying he would address the deficiencies in Dr. Sawicky's testimony on cross-examination. During the testimony of the two experts, counsel made no objection to the admissibility of their opinions but merely challenged the basis for their opinions. Thus, any objection to the admissibility of the experts' opinions was waived. (Evid. Code, § 353.)

The balance of appellant's argument consists of assailing the professional competence of Dr. Sawicky's evaluation of Ms. Odian and the credibility of the Robinsons. She points out that they were the only witnesses whose testimony supports a finding of undue influence. However, the testimony of a witness whom the trier of fact believes, whether contradicted or uncontradicted, is substantial evidence, and we must defer to the trial court's determination that these witnesses were credible. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479]; *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 [85 Cal.Rptr.2d 386].) More importantly, however, appellant's argument inverts the burden of proof: Once her status as a care custodian was established, the burden shifted to her to rebut the presumption of undue influence. (*Estate of Shinkle, supra*, 97 Cal.App.4th at p. 1007.) The presumption renders any deficiencies in the respondents' affirmative evidence of undue influence irrelevant. (*Estate of Auen* (1994) 30 Cal.App.4th 300, 313 [35 Cal.Rptr.2d 557].) Appellant discusses the evidence she presented to rebut the presumption and argues, in effect, that her evidence was more persuasive. However, the weight and persuasiveness of the evidence is a matter exclusively for the trier of fact, and we cannot say as a matter of law that appellant's evidence was sufficient to overcome the presumption of undue influence. (*Howard v. Owens Corning, supra*, 72 Cal.App.4th at p. 631.)

## II.

## SUBSTANTIAL EVIDENCE SUPPORTS THE FINDINGS OF UNDUE INFLUENCE AND LACK OF LEGAL CAPACITY*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 152.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.

Gaut, J., and King J., concurred.