[No. F058119. Fifth Dist. Sept. 15, 2010.]

Estate of DONALD RICHARD AUSTIN, Deceased.
DAWN MAREE AUSTIN, Petitioner and Appellant, v.
DEBRA SIMPSON, Objector and Respondent.

COUNSEL

Michael A. Milnes for Petitioner and Appellant.

Nancy J. LeVan for Objector and Respondent.

OPINION

**HILL, J.**—Probate Code section 21350 invalidates certain donative transfers from a dependent adult to his or her care custodian for the protection of the dependent adult. Pursuant to that section, appellant sought to invalidate gifts given by decedent to respondent. The trial court concluded appellant failed to prove respondent was decedent's care custodian, and held the gifts were valid. Substantial evidence supports the trial court's findings, and we affirm.

## *FACTUAL AND PROCEDURAL BACKGROUND*

Appellant, Dawn Maree Austin (Dawn),[1] the daughter of decedent, Donald Richard Austin (Donald), apparently petitioned to be appointed the personal representative of Donald's estate.[2] Respondent, Debra Simpson (Debra), who is the daughter of Donald's former wife, filed an objection to that petition. The trial court ordered the public administrator to administer the estate. Questions arose regarding whether certain gifts Donald gave to Debra in the form of checks were invalid pursuant to provisions of the Probate Code. Debra turned over the funds from the checks to the public administrator pursuant to court order. The court conducted a trial and determined the gifts to Debra were valid. Dawn appeals.

---

[1] Some parties and other participants share last names. We refer to them by their first names in the interests of clarity and brevity, and not out of disrespect.

[2] The petition is not in the record on appeal. We assume from the filing of the objection and from statements in documents in the record that such a petition was filed.

Debra's mother, Geneva Simpson (Geneva), was married to Donald from 1986 to 1994. They divorced in 1994 "for Medi-Cal reasons," but continued to live together. Debra lived next door to them for 22 years. In 2006, Donald broke his hip, then had triple bypass surgery three weeks later. He was in a nursing home in November 2006 after his bypass surgery. He returned home, but when he was no longer able to take care of himself, he was placed in a nursing home. He remained in nursing homes until his death on December 23, 2007.

Prior to Donald's death, his mother passed away and his brother, Wesley Austin (Wesley), became successor trustee of her trust. In April or May 2007, Wesley and his wife, Janice (Janice), learned Donald would receive funds from that trust. They went to see Donald at the nursing home and asked what he wanted to do with the funds. On their third visit in three weeks, Donald had decided he wanted Debra to have the money. Wesley and Janice called Debra and asked her to come to the nursing home. Wesley handed the first check to Donald, who signed it, handed it to Debra, and said, "Here, this is yours." Wesley received the second check from the life insurance company; he took it to Donald, who signed it over to Debra and told Wesley to take it to her. Wesley delivered it to Debra personally. The remaining four checks were written by Donald to Debra, and Wesley and Janice had no knowledge of them. The six checks were dated between April 5 and July 10, 2007, and totaled approximately $185,000.

Dawn contends Debra was a "care custodian of a dependent adult" as that term is used in Probate Code section 21350, and is therefore a person disqualified from receiving a transfer of property from that dependent adult. On this basis, she contends the transfer of funds from Donald to Debra by means of the checks was invalid and the funds should become part of the probate estate.

## *DISCUSSION*

█ Probate Code section 21350[3] invalidates donative transfers to certain disqualified persons. As relevant here, it provides:

"(a) Except as provided in Section 21351, no provision, or provisions, of any instrument shall be valid to make any donative transfer to any of the following: [¶] . . . [¶]

"(6) A care custodian of a dependent adult who is the transferor."

Section 21351 sets out exceptions to the invalidity provided for in section 21350. It provides, in relevant part:

---

[3] Further statutory references are to the Probate Code, unless otherwise indicated.

"Section 21350 does not apply if any of the following conditions are met:

"(a) The transferor is related by blood or marriage to . . . the transferee . . . . [¶] . . . [¶]

"(d) The court determines, upon clear and convincing evidence, but not based solely upon the testimony of any person described in subdivision (a) of Section 21350, that the transfer was not the product of fraud, menace, duress, or undue influence." (§ 21351, subds. (a), (d).)

■ These sections "effectively establish a presumption affecting the burden of proof that a gift to a disqualified person was procured by fraud, menace, duress, or undue influence." (*Graham v. Lenzi* (1995) 37 Cal.App.4th 248, 257 [43 Cal.Rptr.2d 407] (*Graham*).) The transfer may be held valid if the transferee rebuts the presumption by proving one of the exceptions set out in section 21351. (*Bernard v. Foley* (2006) 39 Cal.4th 794, 800 [47 Cal.Rptr.3d 248, 139 P.3d 1196] (*Bernard*).)

The presumption of invalidity arises "[o]nce it is determined that a person is prohibited under section 21350 from receiving a transfer." (*Bernard, supra,* 39 Cal.4th at p. 800.) Thus, before the presumption of invalidity arises, the party asserting invalidity must prove the transferee is one of the disqualified persons listed in section 21350, subdivision (a). (*Graham, supra,* 37 Cal.App.4th at p. 255.) If that party successfully does so, the burden shifts to the transferee to prove one of the exceptions in section 21351 applies. Consequently, Dawn bore the initial burden of proving Debra was disqualified from receiving the transfers of property. Only if she successfully met that burden would Debra be required to prove either that she was related to Donald or, by clear and convincing evidence not based solely on her own testimony, that the transfers were not the product of fraud, menace, duress, or undue influence.

The trial court found that Dawn did not meet her initial burden of proving Debra was a disqualified transferee under section 21350, subdivision (a). It concluded Dawn failed to prove Debra met the definition of a care custodian. Substantial evidence supports the trial court's conclusion that Dawn failed to establish Debra was Donald's care custodian at the time of the transfers.

■ Section 21350, subdivision (c), adopts the definition of the term "dependent adult" set forth in Welfare and Institutions Code section 15610.23, which defines a " '[d]ependent adult' " as "any person between the ages of 18 and 64 years who resides in this state and who has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights, including, but not limited to, persons who have

physical or developmental disabilities, or whose physical or mental abilities have diminished because of age." (Welf. & Inst. Code, § 15610.23, subd. (a).) Its definition also "includes any person between the ages of 18 and 64 years who is admitted as an inpatient to a 24-hour health facility, as defined in Sections 1250, 1250.2, and 1250.3 of the Health and Safety Code." (Welf. & Inst. Code, § 15610.23, subd. (b).) Section 21350, subdivision (c) extends the definition to persons who are "older than age 64."

Testimony at trial indicated that, at the time the checks were given to Debra, Donald was 72 years old and a resident of a nursing home. He had been placed in the nursing home because his health had declined and he was unable to care for himself after suffering a broken hip and undergoing triple bypass surgery. The parties do not dispute that he was a dependent adult for purposes of section 21350, subdivision (a)(6).

Section 21350, subdivision (c), adopts the definition of "care custodian" found in Welfare and Institutions Code section 15610.17, which provides:

" 'Care custodian' means an administrator or an employee of any of the following public or private facilities or agencies, or persons providing care or services for elders or dependent adults, including members of the support staff and maintenance staff: [¶] . . . [¶]

"(y) Any other protective, public, sectarian, mental health, or private assistance or advocacy agency or person providing health services or social services to elders or dependent adults."

■ The definition is not limited to paid professional caregivers; it includes a person who provides health services or social services to a dependent adult as a result of a preexisting personal friendship with the dependent adult. (*Bernard, supra*, 39 Cal.4th at p. 797.) In *Bernard*, the decedent resided with her longtime friends, Foley and Erman, during the two months just prior to her death. (*Id.* at p. 798.) Three days before her death, the decedent amended her trust to make Foley and Erman each a 50 percent residuary beneficiary of the trust; neither had been named in prior versions of the trust. (*Ibid.*) During the time the decedent resided with Foley and Erman, she was incapable of caring for herself and was dependent on them for her daily needs. (*Id.* at p. 805.) Foley did the decedent's grocery shopping, prepared some meals for her, made her bed, helped with bathing, sometimes helped change her diapers, applied topical medications to her body, checked her mail, and handled all her financial and investment matters, including her bank accounts. (*Ibid.*) Erman spent every day with the decedent, prepared her meals, assisted her to and from the bathroom, helped her into bed, fixed

her hair, cleaned her bedroom, did her laundry, administered oral medications, applied ointments to a rash, and applied salves and antibiotics to sores on her legs. (*Ibid.*)

The court upheld the finding that Foley and Erman were care custodians. It concluded: "In sum, the record reflects that both Foley and Erman provided substantial, ongoing health services to decedent while, at the end of her life, she was residing in their home and that it was during this period that decedent amended her Trust to include the donative transfers at issue." (*Bernard, supra*, 39 Cal.4th at p. 805.) The court characterized their services as " 'a far cry from the level of care provided by the longtime friends in [*Conservatorship of*] *Davidson* [(2003) 113 Cal.App.4th 1035 [6 Cal.Rptr.3d 702]].' " (*Id.* at p. 806.)

*Conservatorship of Davidson, supra*, 113 Cal.App.4th 1035 (*Davidson*) was decided prior to *Bernard* and was disapproved by *Bernard* to the extent it interpreted section 21350 as excluding from the definition of a "care custodian" those caregivers whose service relationship with the dependent adult arose out of a preexisting personal friendship rather than a professional or occupational connection. (*Bernard, supra*, 39 Cal.4th at p. 816, fn. 14.) Although the *Davidson* decision was primarily grounded on its conclusion that caregivers who cared for a dependent adult as a result of a preexisting friendship were not care custodians within the statutory definition, it also suggested that the types of household tasks performed by the alleged care custodian there did not qualify as " 'health services or social services' " for purposes of section 21350. (*Davidson, supra*, 113 Cal.App.4th at p. 1050.) The care provided by Gungl, the alleged care custodian, "consisted of cooking, gardening, driving [the decedent] to the doctor, running errands, grocery shopping, purchasing clothing or medications, and assisting her with banking." (*Ibid.*) The court noted that, prior to the time she executed the trust instrument by means of which she left the bulk of her estate to Gungl, the decedent "administered her own medications and basically took care of herself, with some assistance from her housekeeper" and "was still essentially maintaining her independence." (*Ibid.*) It was not until two years later that decedent "declined to the point that she required more sustained, around-the-clock care and assistance" and was placed in a care facility. The court stated: "In short, the kinds of errands, chores, and household tasks performed by Gungl for and on Davidson's behalf simply cannot be equated with the provision of 'health services and social services' specified by the subject statutes as constituting custodial care." (*Ibid.*)

■ In *Estate of Odian* (2006) 145 Cal.App.4th 152 [51 Cal.Rptr.3d 390] (*Odian*), the decedent executed a will and trust leaving her entire estate to Catharina Vulovic, who had worked for the decedent as her paid live-in

companion for approximately two years before the decedent moved into a nursing home. The decedent executed the will and trust during the time Vulovic worked for her. In determining whether Vulovic was a care custodian, the court opined "that the Legislature intended the definition of 'care custodian' as used in Welfare and Institutions Code section 15610.17 to apply expansively to protect vulnerable elders. There is no reason to believe that it intended a narrower application of the identical term when it enacted section 21350(a)(6). On the contrary, an expansive interpretation of 'social services' to include personal services provided by an in-home caregiver best promotes the Legislature's objective of protecting vulnerable dependent adults from exploitation." (*Id.* at pp. 166–167.) The court concluded: "Here, the trial court found that appellant was employed 'to provide in-home care.' In that capacity, she 'cooked, cleaned and drove [Ms. Odian] to appointments, meetings and shopping' *and* 'took care of [Ms. Odian's] home, took care of [Ms. Odian] and was [Ms. Odian's] paid live-in caregiver.' Appellant does not dispute those findings. A 'paid live-in caregiver' clearly provides social services within the meaning of section 21350(a) and is, therefore, a care custodian." (*Odian, supra,* 145 Cal.App.4th at p. 167.)

Donald made the gifts to Debra while he was residing in a nursing home. There was no evidence Debra was providing any health or social services to him at that time. The evidence showed that Donald had been able to take care of himself, and Debra did not provide assistance to him, until he broke his hip in October 2006 and had triple bypass surgery three weeks later. Donald was in a nursing home during November 2006, while recovering from the bypass surgery, and was in nursing homes in 2007 due to failing health. At other times after he became ill, Debra lived next door and "took him to his doctors appointments . . . prepared meals for him, helped out wherever [she] could." Her mother also prepared some of Donald's meals, but Debra took him to all of his doctors appointments. This was the full extent of the evidence concerning the services Debra provided to Donald.

There was no evidence Debra was ever a paid live-in caregiver for Donald. The services Debra provided to Donald were significantly less extensive than those provided by the caregivers in *Bernard* and *Davidson.* They could not reasonably be characterized as substantial, ongoing health services or social services. *Davidson* expressed doubt that "cooking, gardening, driving [the decedent] to the doctor, running errands, grocery shopping, purchasing clothing or medications, and assisting her with banking" qualified as health services or social services within the definition of care custodian. (*Davidson, supra,* 113 Cal.App.4th at p. 1050.) Debra's services were much more limited, consisting only of driving Donald to the doctor, preparing some of his meals, and unspecified helping out.

■ Substantial evidence supports the trial court's conclusion that Debra did not become Donald's care custodian as a result of the limited services she performed for him while he was not in a nursing home. Dawn failed to carry her burden of proving Debra was a disqualified transferee as defined in section 21350, subdivision (a)(6). Accordingly, the burden never shifted to Debra to prove she fell within any exception set out in section 21351.[4]

## *DISPOSITION*

The judgment is affirmed. Respondent, Debra Simpson, is awarded her costs on appeal.

Cornell, Acting P. J., and Kane, J., concurred.

---

[4] The trial court also found Dawn failed to prove that the gifts should be invalidated based on a common law claim of undue influence. Dawn does not challenge that determination in this appeal and we do not address it. (See *Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125 [36 Cal.Rptr.3d 6] ["an appellant's failure to discuss an issue in its opening brief forfeits the issue on appeal."].)